## MUTUAL BEN. LIFE INS. CO. v. ROBISON.

(Circuit Court, N. D. Iowa, E. D.    March 21, 1893.)

1. LIFE INSURANCE—POLICY—FOREIGN COMPANIES—WHAT LAW GOVERNS—APPLICATION.

Where an application for insurance is made in one state, by a resident and citizen thereof, through agents located therein, to an insurance company of another state, the policy, though actually issued in such other state, to take effect by its terms upon payment of first premium, and the policy is delivered and premium paid in the state where the application is made, the law of that state governs the interpretation and force of the contract.

2. SAME.

An insurance company undertaking to do business in a state other than that of its home and policy issuing office is subject, with reference to such business, to the terms and conditions by the laws of such state imposed on such business.

3. SAME.

An insurance company doing business in a state other than that of its home office will not be permitted to withdraw the business done in such state from the obligatory force of the statutes of that state, by the insertion, in its forms of application or policy, of a clause expressly providing that the law of the state of its home office shall govern its contracts of insurance.

4. SAME—CANCELLATION OF POLICY—ESTOPPEL.

Where an insurance company has accepted the premiums, and the insured has relied on the indemnity contract provided in the policy, the insurance company is as much estopped to cancel the policy after the insured has become in such a physical condition that he cannot obtain desirable insurance upon his life in any reputable company as it would be estopped to avoid the policy after the insured's death.

In Equity.    Suit by the Mutual Benefit Life Insurance Company against Charles W. Robison to cancel insurance policies.    Bill dismissed.

Henderson, Hurd, Daniels & Kiesel, for plaintiff.
Utt Bros. & Michel, for defendant.

WOOLSON, District Judge.    The plaintiff, a corporation organized under the laws of the state of New Jersey, and being a purely mutual insurance society or corporation, has brought this action, in equity, to cancel four policies of insurance, of $5,000 each, which were by plaintiff issued to, and which are held by, defendant, who is a resident and citizen of the state of Iowa.    The evidence shows that on March 17, 1890, the defendant signed a written application to the plaintiff company for $20,000 life insurance upon his own life, and that, as requested by him, the plaintiff company duly issued to him, and on his own life, four policies of life insurance in the plaintiff company, each policy being dated March 24, 1890, and the same being numbered, respectively, Nos. 157,618, 157,619, 157,620, and 157,621, of said plaintiff company; that, at the date of said application, defendant was, and for over 30 years theretofore had been, a resident of the city of Dubuque, Iowa; that, at said date, one T. F. McAvoy was the general agent for the state of Iowa of the plaintiff company, and Charles J. Brayton was the agent at Dubuque of said

company; that, prior to said date, said agent Brayton and defendant had interviews on the subject of defendant's taking out insurance in said plaintiff company; that, at that date, the plaintiff had two local medical examiners in its employ at said city; and that said Brayton had informed defendant that the medical examination, required of all applicants for insurance, might be made by either of these two examiners; and that defendant elected to have the same made by Dr. G. M. Staples, one of said medical examiners, and who for many years had been the family physician of the defendant.

On said March 17, 1890, defendant presented himself before Dr. Staples for such medical examination, which was had, and the results thereof were entered upon one of the company's blanks, which had been furnished for that purpose by Agent Brayton. Said examination having been completed, defendant subscribed said application at the several places thereupon required. Said medical examiner and said Agent Brayton and said State Agent McAvoy signed it also; and, said state agent having forwarded it to the home office of the plaintiff company, the four policies above described were issued, and were forwarded by plaintiff to said state agent, who, in turn, sent same to said Agent Brayton, at Dubuque, who collected from defendant the premiums therefor, and thereupon delivered said policies at Dubuque to defendant. Shortly before the second payment of premium, or premium falling due in March, 1891, became due, the plaintiff company had received information, as its officers believed, that certain answers by defendant subscribed in said application were untrue; and thereupon plaintiff tendered back to defendant the premium received, with interest, and refused to receive said second premium or payment, (which defendant tendered,) and brought this action to cancel said policies. The answers whose untruthfulness plaintiff urges as the grounds for such cancellation are two:

"Have you ever had * * * spitting of blood?" Answer: "No."
"For what have you sought medical advice during the past seven years? (b) Dates? (c) Duration? (d) Physicians consulted?" Answer: "Debility from overwork. (b) February, 1888. (c) 10 days. (d) G. M. Staples."

A third ground was alleged in petition, relating to varicose veins; but this ground was abandoned, no evidence relating thereto was taken, and counsel stated the same was not pressed.

The claim of the plaintiff is that by the terms of the application which defendant signed, as well as by the face of the policies, such answers are made warranties whose untruthfulness avoids the contract of insurance, and entitle plaintiff to a decree of cancellation. The phraseology of the application does not materially differ on this point from that in general use by life insurance companies:

"I hereby agree that the answers given herewith to the questions of the agent and examiner, which I declare and warrant to be true, shall be the basis of my contract with the company."

So that, if these answers are not true, and plaintiff is entitled herein to urge their falsity, a decree canceling said policies should be entered.

At the very threshold of our investigation, we are met with the opposing claim of the parties as to the state whose laws are to be held applicable to the construction and force of the contract of insurance sought to be canceled. Plaintiff contends that, by the very phraseology of the application which defendant signed, this question is decided against defendant. The application states (and immediately following the quotation above given therefrom) that "such contract shall at all times and places be held and construed to have been made in the city of Newark, New Jersey." Therefore plaintiff, applying the laws of the state of New Jersey, and the construction thereof as given by the supreme court of that state, argues with much force for the decree of cancellation. Defendant contends that the laws of the state of Iowa, and the construction thereof as given by the supreme court of that state, are to be applied. The seeming importance of this contention demands that this point shall be first settled. The underlying principle which plaintiff claims is conclusive of this contention has frequently, in its general scope, been before the supreme court of the United States. Perhaps it has received no clearer consideration than that given in Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. Rep. 102. Speaking of this point, as now urged by plaintiff, Mr. Justice Matthews says:

"The law we are in search of which is to decide upon the nature, interpretation, and validity of the engagement in question is that which the parties have, either expressly or presumptively, incorporated into their contract as constituting its obligation. It has never been better described than it was incidentally by Chief Justice Marshall in Wayman v. Southard, 10 Wheat. 48, where he defined it as a principle of universal law: 'The principle that in every forum a contract is governed by the law with a view to which it is made.' * * * And in Lloyd v. Guibert, L. R. 1 Q. B. 120, in the court of exchequer chamber, it was said that 'it is necessary to consider by what general law the parties intended that the transaction should be governed, or rather by what general law it is just to presume that they have intrusted themselves in the matter.' It is upon this ground that the presumption rests that the contract is to be performed at the place where it is made, and to be governed by its laws, there being nothing in its terms or in the explanatory circumstances of its execution, inconsistent with that intention."

And plaintiff urges further that since the policies were signed at and issued from the home office of the plaintiff company in New Jersey, and by their terms the premiums thereon are to be paid at that office, and any loss thereon is also to be paid at said New Jersey office, therefore these facts, in connection with the agreement above quoted from the application, compel the decision in favor of its contention. The general principle of law above stated is too well settled to admit of dispute, as to any contract and set of facts to which it applies; but, like all other general principles, it may have its exceptions, and it is not properly applicable to every contract of insurance. At the date of said application for insurance, defendant resided in the state of Iowa. The soliciting from defendant by plaintiff's agent of insurance, the examination of defendant, the propounding of the questions to him, the giving of his answers thereto, and his subscribing such application, all these took place in Iowa. Defendant's entire connection with the application was in Iowa. The policies were sent by plaintiff to its Iowa state agent, were re-

ceived by him in Iowa, and thence forwarded to the agent at Dubuque, Iowa, who collected at Dubuque, Iowa, from defendant the premiums, and thereupon delivered to defendant, at said Dubuque, the policies. By the very terms of each of the policies, "this policy does not take effect until the first premium shall have been actually paid;" so that the contracts of insurance now sought to be canceled were not to become, and did not become, effective until the payment had been made in Iowa of the first premium thereon. Wall v. Society, 32 Fed. Rep. 273, in the facts last recited, is with the case at bar. In that case the question was squarely presented, "Is the contract sued on governed and to be construed by the laws of the state of New York, or by the laws of the state of Missouri?" Mr. Justice Brewer, (then circuit judge,) on this point says, (page 275:)

> "In respect to the first question, these, I think, must be taken as the accepted facts: The defendant is a New York corporation, doing business in the state of Missouri. The insured was a resident and citizen of Missouri, and made his application here, which was forwarded to New York. The application was accepted, the policy fully prepared and signed in that state, and sent to Missouri, and delivered to defendant here. By the terms of the policy all premiums are payable at the defendant's office in New York. If the sum insured should become payable, the payment is to be made at its office in New York. None of the terms of the policy can be modified except by one of the four general officers of the society, and no modification is claimed. Under these facts, I have little doubt as to the true answer to be made to this question."

And thereupon, holding the insurance contract to be governed by the laws of Missouri, he proceeds to apply the laws of that state. On the trial, judgment having been rendered against the company, the case was taken by the company to the supreme court of the United States. The judgment was there affirmed. Mr. Justice Gray, in delivering the unanimous decision of that court, (140 U. S. 231, 11 Sup. Ct. Rep. 822,) substantially restates the facts as the same are contained in the above extract from Judge Brewer's opinion, adding, however, that "the application declares that the contract shall not take effect until the first premium shall have been actually paid, during the life of the person herein proposed for assurance;" and the opinion concluded that, "upon the record, the conclusion is inevitable that this policy never became a completed contract, binding either party to it, until the delivery of the policy and the payment of the first premium in Missouri; and, consequently, that the policy is a Missouri contract, and governed by the laws of Missouri." Berry v. Indemnity Co., 46 Fed. Rep. 440, contains a clear and positive announcement on the point in question. The point was squarely before the court whether the Missouri statute applied to the case. The trial was had in the western Missouri district. Circuit Judge Caldwell, in a decision giving judgment against the company, says:

> "If this Missouri statute is applicable to the policy in suit, it puts an end to the company's defense. The company contends that it is not applicable. * * * It is said the policy is an Illinois contract. But clearly this is not so. The company established an agency and carried on its business in this state, [Missouri.] It was through that agency the assured, who was a citizen and resident of this state, made his application, and received his policy. The fact

that the policy was signed by the officers of the company in Chicago has no significance. It was transmitted to the company's agent in Missouri, who received the premium, (called in the policy 'an entrance fee,') and delivered the policy to the insured, at his home in this state; and it took effect at that place and from that date."

This case was taken to the circuit court of appeals for the eighth circuit, and judgment affirmed. 50 Fed. Rep. 511, 1 C. C. A. 561. In the opinion rendered by that court, Judge Shiras specially considers this point:

"It appears from the findings of fact that the company is a corporation created under the laws of Illinois; that it was engaged in soliciting business in Missouri, having agents in the latter state for that purpose; that, by the express terms of the charter of the company, the contract of insurance does not become binding until the delivery thereof to the insured; and that the policy sued on in this case was delivered by the agent of the company to [insured] at Trenton, Missouri, at which place the application for the issuance of the policy had been made and delivered to the agent of the company. Under these circumstances, it cannot be successfully maintained that the contract was made in Illinois. In its inception and completion it was made in Missouri, and is therefore to be construed in connection with the provisions of the statutes of that state. The facts of this case bring it clearly within the ruling of the supreme court in Assurance Co. v. Clements, 140 U. S. 226, 11 Sup. Ct. Rep. 822, in which it is held that a policy issued in New York, by a corporation of that state, upon the life of a resident of Missouri, it being provided that the contract should not take effect until actual payment of the first premium, did not become a completed contract until the payment of the first premium and delivery of the policy; and that, as these acts were done in Missouri, the policy must be deemed to be a Missouri contract, and to be governed by the laws of that state."

We are therefore justified in holding that, unless the clause in the application (with reference to construing the contract as made in New Jersey) shall take the case out of the rule as clearly established with reference to the point under consideration, the contracts set out in petition herein must be construed by the laws of the state of Iowa.

So far as this point under consideration affects the grounds on which the plaintiff company claims cancellation of defendant's policies, it may be here stated (leaving details for later mention) that, if defendant's contention is sustained, the agent, state agent, and medical examiner are to be regarded as agents of plaintiff in their dealings with defendant in the matters complained of in the petition, and the facts and conversations attending the medical examination of defendant may be admitted in evidence; while, if plaintiff's contention is sustained, evidence as to these attendant facts and circumstances will, as plaintiff claims, become incompetent as against the written answers in the application. The materiality of this contention is evidenced by the thoroughness and force with which each party has presented his side of the discussion. Section 1 of chapter 211 of Acts of 18th General Assembly of Iowa (Laws 1880) is as follows:

"Any person who shall hereafter solicit insurance or procure applications therefor shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application or on a renewal thereof, anything in the application or policy to the contrary notwithstanding."

No like statutory provision is shown to be contained in the laws of New Jersey.

Assuming that plaintiff's contention, if sustained, will have the broad effect which it claims for such contention, the question to be solved is whether the defendant is to be permitted to claim the benefits of the Iowa statute, notwithstanding that the application signed by him declares—so plaintiff claims—that the laws of New Jersey shall govern the interpretation and force of the contract. In other words, does not the language of this declaration in defendant's application waive any benefit he might otherwise claim from the Iowa statute? And is it not competent for defendant thus to waive the Iowa statute, and place the contract under the force of the statutes of New Jersey, whence the policies were to and did issue, so that defendant is thereby estopped from claiming that the Iowa statute shall apply thereto? We are not required to consider this question as an original one now first proposed for solution. The law seems well settled in this circuit. In 1882, in Fletcher v. Insurance Co., 13 Fed. Rep. 526, Judge Treat had occasion to consider this question, and the cogent reasoning of his opinion was fully concurred in by Circuit Judge McCrary:

"Inasmuch as the policy sued on declares that it rests on the basis of answers made to the application, and that said policy was to be issued at the home office in New York, on return thereto of the application, can the plaintiff avail himself of the force of the Missouri statute? The defendant company was doing business in Missouri, with the privileges granted to it here, when said insurance was effected. It may be that the formal acceptance of the proposed contract was, by the letter of the contract, to be consummated in New York. The broad proposition, however, remains, no artifice to avoid which can be upheld. The statutes of Missouri, for salutary reasons, permit foreign corporations to do business in the state, on prescribed conditions. If, despite such conditions, they can, by the insertion of clauses in their policies, withdraw themselves from the limitations of the Missouri statutes, while obtaining all the advantages of the license, then a foreign corporation can upset the statutes of the state, and become exempt from the positive requirements of law. Such a proposition is not to be countenanced. The defendant corporation chose to embark in business within that state, under the terms and conditions named in the statute. It could not by paper contrivances, however specious, withdraw itself from the operation of the laws, by the force of which it could alone do business, within the state. To hold otherwise would be subversive of the right of a state to decide on what terms, by comity, a foreign corporation should be admitted to do business or be recognized therefor within the state jurisdiction. Each state can decide for itself whether a foreign corporation shall be recognized by it, and on what terms. Primarily, a foreign corporation has no existence beyond the territorial limits of the state creating it, and, when it undertakes business beyond, it does so only by comity. The defendant corporation, having been permitted to do business in Missouri, under the statutes of the latter, was bound by all the provisions of those statutes, and could not, by the insertion of any of the many clauses in its form of application, etc., withdraw itself from the obligatory force of the statute. The contract of insurance, therefore, is a Missouri contract, and subject to the local law."

This case was taken to the supreme court of the United States, and is found in 117 U. S. 519, 6 Sup. Ct. Rep. 837. The point just quoted from Judge Treat's opinion is touched upon but slightly, but the justice writing the opinion uses this language:

"The company is a corporation under the laws of New York, but it also transacts business in Missouri, through agents residing there, and, of course, with reference to the business done in that state, is subject to its laws."

In Wall v. Society, 32 Fed. Rep. 273, (to which reference was above made,) Circuit Judge Brewer had occasion to consider this question. The defendant company had set up as grounds of defense against the claim on the policy that the contract of insurance was to be construed under and governed by the laws of the state of New York, and therefore, because of nonpayment of premium, the insured was entitled but to the surrender value which was named in the policy; whereas, if the Missouri law applied, the holder of the policy would be entitled to a much larger amount, under the provisions of the Missouri statute. The company's answer set up its contention on this point, and its claim to have the policy construed by the New York law. The holder moved to strike out these portions of the answer. Judge Brewer held, as we have seen, supra, that the contract was to be governed by the Missouri law. The court was then brought directly to the point as to whether the stipulation in the contract providing for the payment, in case of forfeiture for nonpayment of premium, of the amounts therein stated, (which we may call "forfeiture values,") constituted a waiver of the provisions of the Missouri statute, and was binding on the insured. After quoting the Missouri statute as to forfeiture values, he says:

"Now, in the policy sued on, there is a nonforfeiture clause, but containing a different provision; and it is alleged that in the application the insured waived and relinquished all right or claim to any other surrender value than that provided in the policy, whether required by the statute of the state or not. This is the doubtful question. It is strenuously insisted by the defendant that the statute of Missouri neither forbids nor declares null, nor makes anywise illegal, such a waiver as the one in question; that it merely gives a right or privilege to the insured, which, like any other personal right or privilege, he may, for sufficient consideration, waive; and that such waiver, not being forbidden by the statute, is not contrary to public policy, in any such sense as that the courts should refuse to enforce it. Back of this argument, and strongly supporting it, is that liberty of contract which courts are strenuous to uphold."

After considering arguments, based on what he calls "a purely technical construction" of the statute, Judge Brewer states:

"I am disposed to rest my conclusion more upon the matter of public policy. And here the history of insurance must be taken into consideration. It is notorious that many insurance companies were rigorous in insisting upon forfeitures, sometimes under very inequitable circumstances, and there was no little public clamor by reason thereof. Such clamor prompted many legislatures to interfere, and to seek by legislation to protect what they supposed to be the rights of the insured. Such seems to have been the thought of the Missouri legislature, and it evidently intended by its legislation to provide a fixed and absolute rule applicable to all cases,—absolute and universal because if it applied only in the cases where the policies were silent, or, if it could be waived or changed, a child can see that it would protect only so far as the insurance companies were willing. So, though no words of penalty are attached, no express denial of the right to waive, in fact no words of negation in any direction, yet it seems to me fair to say that the affirmative words of the statute disclose a public policy which no court ought to question or refuse to enforce. Railway Co. v. Peavey, 29 Kan. 169. The legislature has by

this language declared a rule in respect to forfeitures in life insurance policies. It has thus established the policy which it believes should obtain in this state; and, though sitting on the federal bench, it is my duty to administer the laws of this state in the spirit in which they were enacted, and to uphold both their letter and spirit. It is voluntary with any foreign insurance company whether it shall come into this state to transact business. Coming in, it should be willing to comply with all the statutes as to all business arising within this state, and no court, least of all a federal court, should hasten to release it from this obligation. From these views, and with this feeling, I am constrained, though with grave doubts, to sustain the motion to strike out."

While this case was pending in the supreme court of the United States, on writ of error, the case of Berry v. Indemnity Co. was decided by Circuit Judge Caldwell, (46 Fed. Rep. 439.) In his decision, after holding the contract of insurance to be a Missouri contract, and not a contract of the state in which the home office of the company issuing the policy was located, Judge Caldwell proceeds (page 441) as to the point we are now considering:

"Corporations are artificial creations, and have no natural rights, and their constitutional and legal rights, in some respects, fall short of those of natural persons. A state cannot deny to the citizens of other states the right to do business within its limits, but it may deny such right absolutely to corporations of other states, or it may admit them to do business on such terms and conditions as it is pleased to prescribe; and, when an insurance company of one state does business in another, the laws of the latter prescribing the terms and conditions upon which it is allowed to do business in the state are obligatory upon it. These conditions may extend to the form and legal effect of the company's policies; and if, in the course of its business in the state it issues policies on the lives or on the property of the citizens of the state which contain conditions prohibited by or in contravention of the laws of the state, such conditions are void. Doing business in the state brings the policy within the operation of its laws, notwithstanding the policy may be signed, and the loss made payable, in another state. In such cases the company cannot, by any contrivance or device whatever, evade the effect and operations of the laws of the state where it is doing business. Wall v. Society, 32 Fed. Rep. 273."

Within a few days after Judge Caldwell rendered this decision, the supreme court of the United States decided the Wall Case, and same is contained in 140 U. S. 226, and 11 Sup. Ct. Rep. 822, under the title Equitable Life Ins. Co. v. Clements. As to the binding force of the Missouri statutes, and the stipulations in contract purporting to waive it, the court says:

"The manifest object of this statute, as of many statutes, regulating the form of insurance policies on lives or against fires, is to prevent insurance companies from inserting in their policies conditions of forfeiture or restriction, except so far as the statute permits. The statute is not directory only, or subject to be set aside by the company, with the assent of the insured; but it is mandatory, and controls the nature and terms of the contract into which the company may induce the assured to enter. * * * It follows that the insertion in the policy of a provision for a different rule of commutation from that prescribed by the statute in case of default of payment of premium after three premiums have been paid, as well as the insertion in the application of a clause by which the beneficiary purports to 'waive' and relinquish all right and claim to any other surrender value than that so provided, whether required by a statute of any state or not, is an ineffectual attempt to evade and nullify the clear words of the statute."

As evidencing the positiveness with which the rule so stated by the supreme court is followed in this circuit, it may be noted that in

May, 1892, the circuit court of appeals of this circuit, in Indemnity Co. v. Berry, 50 Fed. Rep. 511, 1 C. C. A. 561, affirmed the decision of Circuit Judge Caldwell, as above given. A clause in the policy declared in most unequivocal terms that the policy should become null and void "in case of self-destruction of the holder of the policy, whether voluntary or involuntary, sane or insane;" while the Missouri statute provided that it should be no defense that the insured committed suicide, "unless the assured contemplated suicide at the time he made the application for the policy; and any stipulation in the policy to the contrary is void." Judge Shiras, speaking for the court of appeals, says:

"When, therefore, the policy sued on in the present case was issued and delivered to [the assured] in Missouri. the clause found therein touching the liability for death by suicide was nugatory, under the provisions of the statutes of Missouri then in force, provided the policy or contract of insurance is of such a nature as to be subject to the section of the statute in question."

We are, then, justified in holding that, so far as the Iowa statute above quoted may apply to the contracts of insurance at bar, the Iowa law is the law which is to govern and to furnish the rule of construction, "anything in the application or policy to the contrary notwithstanding;" and the waiver thereof, as claimed by plaintiff, is ineffectual.

We come now to the particular facts as proven in evidence touching the two grounds of action urged herein. The evidence shows an entire absence of any intent or desire on the part of defendant to defraud the plaintiff company. While the petition, and some portions of the argument on the hearing, allude to defendant as having intentionally deceived and misled the company into issuing the policies in suit, I find nothing in the evidence justifying such statements. The evidence, as presented, relates to but one circumstance or incident as to which the plaintiff claims the answers above quoted of defendant are untrue. The medical examination of defendant occurred in March, 1890. The question as to seeking medical advice related to the preceding seven years, while the question of spitting of blood was without limit in the question itself. But plaintiff has attempted to prove and urges but one incident or transaction as proof of the untruthfulness of these answers. This occurrence is shown to have happened in October, 1887. I find such occurrence, as proven, to have been that at that time defendant's wife was approaching confinement, and, as defendant was starting for his office one morning, he was directed by the attending physician to procure some chloroform as he went to his office, and if during the day the presence of defendant was needed at his home the physician would telephone for him. Defendant procured the chloroform; and early in the afternoon the physician telephoned defendant to come home immediately. Defendant was then at his office, nearly a mile from his home. He at once started for his horse, which he had left standing in a shed near by, but found some one had taken the horse out. Hastening to a near street, he hoped to catch a street car which ran past his residence. No car was in sight. He then started on a run for his

home, in his eager haste running a couple of blocks, and then walking a block to rest himself and regain his breath, keeping a lookout meanwhile for a car or vehicle on which he might be carried. After having thus proceeded a half mile or more, and when in a highly nervous and excited condition, to a point almost of physical exhaustion, in attempting to step upon or over a curb, he tripped and fell. As he rose and started again, he noticed that he expectorated some blood. Not knowing where this blood came from, and being alarmed at the unusual occurrence, he crossed over the street to the office of Dr. Waples, and asked him what it meant. Dr. Waples told him he was greatly excited, and had him lie down and quiet himself. This blood expectoration soon ceased. Defendant says it was saliva, mixed with blood; and, at plaintiff's question, he attempts to particularly describe it. He also says that in quantity it was "not as much as there comes from the ordinary pulling of a tooth." Dr. Waples accompanied defendant home, where defendant remained a couple of days, his wife meanwhile passing through her confinement. On the second day thereafter, defendant went to his business place, on his way stopping at the office of his family physician, Dr. G. M. Staples, to whom he narrated the occurrence in detail. (The evidence does not disclose why the family physician had not attended the wife, nor is it material.) Dr. Staples carefully examined defendant's lungs, and pronounced them sound and unaffected. On examining the throat he stated to defendant that he found a scar, apparently of a rupture in a small blood vessel in the throat, which the doctor then pronounced as the cause of the expectoration of blood; and he assured defendant that the occurrence did not amount to anything; that he "frequently had such cases in his office of perfectly healthy persons expectorating blood from the throat," and for defendant to go on about his business, which defendant did. The evidence, given by defendant, is uncontradicted that never before nor since that time, up to the medical examination, had he ever spit blood, except as he had had a tooth drawn or bit his tongue. His words answering this question are:

"I have spit blood out of my mouth previously to that time. If you mean whether I ever spit blood out of my mouth, whether from the pulling of a tooth or biting my tongue, I will answer I have. If you mean that I have spit blood coming from my throat, or any of my respiratory organs, or from my stomach, I will answer that I have not."

The facts relating to this occurrence have thus been stated somewhat in detail, as I find them from the evidence, as some evidence was introduced tending to show a state of physical exhaustion of defendant immediately followed this occurrence. This exhaustion is to me not surprising, succeeding, as it did, immediately after the severe physical nervous and excited efforts of defendant to reach his home as speedily as possible with the chloroform, and under the peculiar circumstances under which the effort was made. But I find no statement in substantial contradiction as to the occurrence as I have given it; and the testimony of Dr. Staples, as to his part in the matter, is in substantial accord with defendant's statement. The medical examiner of the plaintiff company who

conducted the examination of defendant, and wrote the answers to which the plaintiff now objects, is the same Dr. Staples who had been the family physician of defendant for many years, and who is referred to in the above statement of the occurrence. According to the testimony of Holden, (medical director of plaintiff,) Dr. Staples had been since 1865 the medical examiner at Dubuque for plaintiff. I find further from the evidence that at the time of such medical examination of defendant for insurance from plaintiff, on March 17, 1890, when the questions to whose answers, as written in the application, plaintiff now excepts, were propounded to defendant by Dr. Staples, defendant recalled to the examiner the particulars of the occurrence, above stated, and again related them to him; that defendant then appealed to the examiner to know what was meant by the term "spitting of blood," and whether the term included this occurrence; that the examiner stated to him that the term did not refer to or include, as used in the application, such an occurrence, but, as there used, meant "the raising of blood from the lungs or bronchial tubes,—diseases supposed to be the precursor of consumption;" and that said examiner said the proper answer was, "No," and he then directed that answer to be written as the same appears on the application. (Owing to the examiner being then afflicted with "writer's cramp," his son wrote, at his dictation, the answers.) The testimony of the examiner on this point is as follows:

"Interrogatory 38. State what was said. Answer. I explained to him that this question, 'Spitting of blood,' was in my judgment, as medical examiner for the company, (it was put there for the purpose of determining whether there was any evidence of consumption,) that the question could not be answered categorically, if you meant spitting of blood from the mouth. Probably no person living but what has spit blood on some occasion when a tooth has been extracted, or after having the nose bleed. Spitting of blood did not mean that. It meant as evidence of hemoptysis or diseases of the pulmonary organs."

I further find from the evidence that, when the question with reference to having sought medical advice was asked defendant, he stated to the medical examiner that except the one time when defendant had consulted Dr. Waples, as above narrated, he had sought no medical advice except from him, (the examiner,) and that he (the examiner) knew more about that than defendant did; that after some talk between them, and the consultation of the examiner's books, (wherein he kept his accounts for medical services rendered,) the examiner stated to defendant that the question did not refer to every slight matter on which a physician's advice had been sought. Here, also, the testimony of the examiner may properly be given:

"Interrogatory 58. Do you remember what was said when the eleventh question was asked Mr. Robison,—'For what have you sought medical advice during the last seven years?' Answer. My recollection is that he said to me that I had attended him during the 7 years, and that I could answer for him. I could tell about what he had sought medical advice for. Int. 59. Did you make an examination of the books at the time to see what he had consulted you for? A. I do not recollect whether I made the examination or not. I had in mind about what I had treated him for. Int. 60. State whether you

talked over with him at that time, and tried to determine what you had treated him for. A. I think I did. Int. 61. State whether he left the answer to that question to you or not. State what Mr. Robison did in relation to the answer to that question. A. We talked over what we prescribed for him, and I think this was the result we came to as to what had been his trouble. Int. 62. State whether it was the result you came to as well as he. A. I said, 'We.'"

On cross-examination the following occurs:

"Interrogatory 11. If you attended Robison within the time you stated, in 1888 and 1889, why did you not remind him of that fact when he answered question 11? Answer. I cannot answer that without a sort of an explanation. Mr. Robison came to our office quite frequently, complaining of some trivial illness, which was largely in his imagination. He is rather cowardly when he is sick or thinks he is. He imagines he has all the illnesses that the human family is heir to. He came to my office frequently, and I could find no trouble that would be worth reporting, and I did not think it necessary to number up all the details of all these little trivial matters that he complained of. That is perhaps an explanation. Int. 12. State if you explained this to Mr. Robison. A. I did. * * * Int. 14. So, in your opinion, these times in 1888 were not of enough importance to appear in answer to this question. A. Most of these times I regarded as such. Int. 15. You have stated that Mr. Robison came frequently. Would he not on a good many of these occasions simply come to have his truss adjusted, or ask about that? A. He came to me sometimes to have his truss adjusted. Sometimes he would want a new truss. Sometimes he would come to talk about an operation, so that he would not have to wear a truss. Sometimes he would complain about something wrong about his heart. I would make an examination, and find nothing wrong about his heart; and he would consult me about little trivial matters, that I did not regard as of enough consequence to write out a volume of and send to the home office. Int. 16. You so informed him when this question No. 11 was asked him? A. I informed him that I did not think it necessary."

I further find from the evidence that, at the time this medical examination was made of defendant by Examiner Staples, plaintiff's agent Brayton and State Agent McAvoy were at the examiner's office. That after Dr. Staples had completed the personal examination, and he and defendant had come out from the private room in which the examination had been held, defendant met Brayton and McAvoy. That conversation was had between them as to defendant's insurance. That it was then understood defendant was to take $5,000 insurance only. That, in the course of the conversation, defendant narrated to the state agent, and in presence of Agent Brayton and the medical examiner, the occurrence above narrated as to the spitting of blood, and his consultation of Dr. Waples about it; and that he had, very shortly after, related the occurrence to Dr. Staples, and had been then examined by him with reference to it; and that, under Dr. Staples' explanation of the term "spitting of blood," he had answered to the question, "No;" and that the state agent then said to defendant, (I now quote from the testimony of Agent Brayton:)

"McAvoy said: 'Dr. Staples has explained to you. You are perfectly right in so stating it, as the question means. "Did you ever have spitting of blood from the lungs;" and where you have apparently answered the question wrong, under the meaning of the question, it is right, as Dr. Staples explained to you. This is one question we have settled satisfactorily with Dr. Staples;' and it was settled satisfactorily to Mr. Robison. I do not remember if there was anything else said on the subject. I have this in my mind because of the fact that I had heard that Mr. Robison had had hemorrhage."

—And that, after the talk between the agents and defendant in which the foregoing occurred, the state agent induced Mr. Robison to increase his application for insurance in the plaintiff company from $5,000 (the amount he had intended) to $20,000, (the amount of the policies in the suit.) The testimony of the plaintiff's medical director Holden shows that McAvoy was state agent for Iowa for plaintiff. Holden disputes the local agency of Brayton; but that is overthrown, and the contrary proven, by the original application produced by plaintiff, whereon appears the certificate and recommendations of defendant's application for insurance as made to plaintiff, and signed by Brayton as agent of plaintiff.

Here, then, we have a case in which the applicant not only has not concealed any facts with reference to himself, but has with special minuteness put plaintiff's agents—local agent, state agent, and examiner—in possession of all the facts because of whose omission in the written application plaintiff now seeks to avoid the policies it has issued to defendant. In this entire transaction defendant appears to have acted towards plaintiff company with the utmost good faith. The evidence fails to sustain any imputation that in any particular defendant sought to impose on plaintiff. A business man himself, defendant seems to have been unusually careful that all the facts touching the matters referred to in the application should be fully and minutely in the possession of plaintiff's agents. Indeed, the evidence shows that defendant was not satisfied during the progress of the examination with the answer, "No," as the examiner had directed it to be written, but called the examiner's attention to it; and, when the examiner stated that he could not make any other answer to the question, defendant asked the examiner if he could not make the company a better answer than the words in the answer in the application; and that Dr. Staples replied he did not think it necessary, but that he could write on the margin of his examiner's report to the company about the blood spitting, or would write a letter to the company, stating how defendant came to spit blood, and when and where, and that he had examined defendant's throat and lungs two days thereafter, and that he had given them a thorough examination, and that, in his opinion, the blood spitting was a trivial matter. That no letter was thus written with these promised contents is not chargeable to the defendant, nor can its absence sustain any imputation of bad faith on his part. This absence is perhaps to be accounted for in the fact developed in Dr. Staples' testimony that, after defendant had concluded to increase the amount of his insurance, the doctor took further time, and more thoroughly performed his examination, and was thereby more thoroughly impressed with the desirability and safety of the risk; hence he might readily have concluded the letter to be more than ever unnecessary. The supreme court of Iowa has in various cases given its construction to the Iowa statute above quoted. In Cook v. Association, 74 Iowa, 746, 35 N. W. Rep. 500, that court has declared that this statute applies to life, as well as fire, insurance; and in Insurance Co. v. Sharer, 76 Iowa, 282, 41 N. W. Rep. 19, that court, speaking of the same statute, has declared:

"The purpose of the statute was to settle as between the parties to the contract of insurance, the relations of the agents through whom the negotiations were conducted. Many insurance companies provided through their applications and policies that the agent through whom the application was procured should be the agent of the assured. Under this provision they were able to avail themselves, in many cases of loss, of defenses which would not have been available if the solicitor had been regarded as their agent, and many cases of apparent hardship and injustice arose under its enforcement; and that is the evil intended to be remedied under the statute, and it ought to be so interpreted as to accomplish that result."

In 1886 the Iowa supreme court, in Donnelly v. Insurance Co., 70 Iowa, 693, 28 N. W. Rep. 607, considered a case where the application for insurance gave the cash value of the building to be insured at $8,000, its erection as in 1872, and the additions thereto as in 1880. The facts, as specially found by the jury, were that its value was $2,000, its erection was in 1844, rebuilt in 1865, and additions made at a later date. The jury further found that the application blank was signed in blank by the plaintiff, and then left with the company's agent, who, on information gained by him, on investigation and from knowledge, wrote the answers to the questions. The company contended that, the statements (warranties) being false, plaintiff could not recover, and the evidence to show that the answers were filled out by the agent, and the manner of such filling out, was incompetent, as varying by parol a written contract. To the first point the supreme court say:

"It will be conceded that the agent was a soliciting agent only, and that he had no power to bind the defendant by any contract he might take. But he made no contract. All that he did was to solicit insurance, and fill up a blank application furnished him by the company. Where an insurance company appoints an agent to solicit insurance, and furnishes him with blank applications, it must be assumed that he is vested with the power to fill up the applications in accordance with the information furnished him by the applicant; and such is the usual practice. For this purpose he is the agent of the company, and if, instead of obtaining the requisite information of the applicant, he obtains it from others, or fills up the application in accordance with his own knowledge and information, and thereon a policy is issued by the company, and the premium paid by the applicant, the company is bound by the statements contained in the application, and the accused is not, in the absence of fraud. It will be conceded that the defendant, when it issued the policy, believed that the plaintiff had furnished the information contained in the application; and that, if it had known the facts, it would not have entered into contract of insurance. But this is immaterial, because the deception was practiced by its own agent, and not by plaintiff."

And the court cites a number of decisions of the court as sustaining the point now stated. To the second point above stated, the court say:

"Counsel are mistaken in the assumption that parol evidence was introduced for the purpose of contradicting the written contract. The force and effect of the statements contained in the application are in no respect impaired, but, under the circumstances disclosed in the evidence, the defendant is estopped from setting up their falsity as a defense to this action."

The supreme court of Iowa, in Hagan v. Insurance Co., 81 Iowa, 321, 46 N. W. Rep. 1114, applied the Iowa statute above cited to a case where the soliciting agent of the insurance company prepared several applications for plaintiff in various companies, in-

cluding defendant company, of which this solicitor was agent, all upon the same property. The assured stated to the agent the gross amount of insurance he desired to carry, and the agent distributed it among the various companies. In the policy in suit the agent entered in the application a statement of concurrent insurance greatly below the actual amount. The court, announcing the rule obtaining in Iowa in the application of the statute to these facts, hold the policy to be effective, and say:

"The company, being charged with the knowledge of its agent, must be considered as having knowledge of the amount of insurance applied for; and, having issued this policy with this knowledge, will be deemed to have waived the condition against concurrent insurance beyond the sum named."

Key v. Insurance Co., 77 Iowa, 174, 41 N. W. Rep. 614, is a case having some features in common with case at bar. Key had bought property on which was situated a dwelling house then occupied by him. He held but a title bond for the premises. When the application for insurance was being made out, Key stated these facts fully to the soliciting agent, who then said to plaintiff, "That did not tell in the policy," but further informed plaintiff that, if at any time he desired to borrow money on the place to complete the payments on it, he would have to get permission from the company before making this loan. The application stated that plaintiff was the sole owner of the premises, and that the same were unincumbered. The application also contained the usual provision making all statements warranties, and avoiding policy if any statement was untrue, etc. In upholding an instruction to the effect that, if the soliciting agent was thus told truthfully the facts relating to plaintiff's title, then his knowledge would be the knowledge of the company, and the company, in issuing and delivering the policy, would be held to have waived any misstatements in the application, the supreme court say: "In taking the application, the agent acted for defendant company. Therefore it is chargeable with knowledge of the facts made known to the agent at the time." And judgment on the policy is sustained. Further reference to cases adjudged by the Iowa supreme court would seem unnecessary; but it may be noted that the Iowa decisions are uniform as to the construction of this statute.

Applying the Iowa statute, as thus construed, to the facts by this court found and above stated, we are brought to the inevitable conclusion that, in the matters relating to and connected with the examination of defendant and the application for insurance herein, Agent Brayton, State Agent McAvoy, and Medical Examiner Staples were the agents of the plaintiff company, and that the statements made known to them by defendant, as above found, were thereby made known to, and became the knowledge of, the plaintiff company; so that, when the policies in suit were issued to defendant, the company must be held to have waived the nonstatements in the application of which it has herein complained.

But counsel for plaintiff insist that the doctrine of Insurance Co. v. Fletcher, 117 U. S. 519, 6 Sup. Ct. Rep. 837, is applicable to the case at bar, and entitles plaintiff to a decree of cancellation. On

examination of that case, it will appear that the facts therein involved, and with reference to which the decision therein rendered must be read, differ materially from the case at bar. The previous decisions of that court, as rendered in Insurance Co. v. Wilkinson, 13 Wall. 222; Insurance Co. v. Mahone, 21 Wall. 152; and Insurance Co. v. Baker, 94 U. S. 610,—had strongly asserted the doctrine that, where the applicant had no knowledge of any limitations upon the agent's authority, insurance companies, acting through agents at a distance from the home office, were bound by the acts of these agents, within the general scope of the business intrusted to them; and when such agents prepared the application wherein the statements are made warranties, and where truthful answers were given by the applicant, but the agent inserted other answers therein, that, even though the applicant signed the application, he was not estopped from showing the actual facts of the occurrence, since the applicant had the right to assume that the answers as thus written had the meaning for the purpose of obtaining the policy of what the agent stated them to be; and that if the agent attempted to construe and interpret the applicant's answers, and inserted his construction and interpretation of them instead of the answers themselves, the company, and not the applicant, would be held responsible therefor, as having prepared the application, and, though the applicant signed it, this would not defeat the policy. In the Fletcher Case, on the contrary, there was brought directly home to the applicant the limitation which the company had placed on the powers of its agents; for the application there signed expressly notified the applicant that as only the officials at the home office have authority to determine whether a policy shall issue on any application, and as they rely only on the written statements and representations referred to, no statements or representations made or information given to the persons soliciting or taking the application for the policy should be binding on the company or in any manner affect its right unless they were reduced to writing, and presented at the home office in the application. And the policy in that case was overthrown, on the expressed and special ground that, under this provision of the application, no statements which the applicant had verbally made at the time the application was made out and signed could be received to affect the application as signed and sent to the home office, and therefore the untrue statements (warranties) therein, by the terms of the contract, rendered the contract of insurance void. What would have been the effect upon the Fletcher Case if that case had arisen in Iowa, and the attempt was made to apply the Iowa statute to it, we do not find it necessary to inquire, for the Fletcher Case and case at bar are otherwise distinguishable, as we have just seen. In Sawyer v. Insurance Co., 42 Fed. Rep. 30, will be found a clear and forcible presentation of the distinguishing points between the Fletcher Case and those preceding it, (which I have named above,) and conclusively showing that the Fletcher Case does not overrule its said predecessors. In the case at bar I find that there is no evidence that defendant had any knowledge of any limitation, if such limitation existed, upon the powers of the

company's said agents within the scope of the business by the plain-tiff company intrusted to them.

The case of Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. Rep. 87, is largely decisive of the case at bar, and much of its reason-ing is directly applicable herein. That was an action upon a policy of life insurance, wherein was involved the Iowa statute above quoted. The company's agent, in taking the application, had answered the question relating to whether the applicant had other insurance upon his life, by writing the words "None other." In fact the applicant at that date held insurance in co-operative insurance companies to the amount of $12,000. The answers were by the contract made warran-ties, and their falsity avoided the contract. The company resisted payment because of this false answer. The evidence showed that the applicant had, in response to this question, truthfully and fully in-formed the agent of the amount of co-operative insurance he was car-rying, and that the agent had declared that he did not regard, nor did the company regard, such co-operative companies as insurance compa-nies, so that the applicant did not, therefore, really hold any insurance whatever at that time; and relying on the construction given by the agent, and under his direction, the applicant had signed the applica-tion with the words therein to which the company objected. One of the provisions contained in that application is as follows:

"And it is hereby further covenanted and agreed that no statements or representations made or given to the person soliciting this application for a policy of insurance, or to any other person, shall be binding on the said com-pany, unless such statements or representations be in writing in this applica-tion when the said application is received by the officers of the said company at the home office of the said company, in Hartford, Conn."

Having quoted this Iowa statute, the supreme court of the United States, in applying that statute to the case in hand, say, (page 310, 132 U. S., and page 89, 10 Sup. Ct. Rep.:)

"The statute was in force at the time the policy in suit was given, and therefore governs the present case. It dispenses with any inquiry as to whether the application or the policy, either expressly or by implication, made Boak the agent of the assured in taking the application. He could not by any act of his shake off the character of agent for the company. Nor could the com-pany by any provision in the application or policy convert him into an agent for the assured. If it could, then the object of the statute would be defeated. In his capacity as agent for the insurance company, he had filled up the appli-cation,—something which he was not bound to do, but which service, if he chose to render it, was within the scope of his authority as agent. If it be said that, by reason of having signed the application after it had been pre-pared, Stevens is to be held as having stipulated that the company should not be bound by his verbal statements and declarations to the agent, he did not agree that the writing of the answers to questions contained in the appli-cation should be deemed wholly his act, and not in any sense the act of the company by its authorized agent. His act in writing the answer which is alleged to be untrue was under the circumstances the act of the company. If he had applied in person to the home office for insurance, stating, in response to the question as to other insurance, the same facts communicated to Boak, and the company by its principal officer, having authority in the premises, had then written the answer, 'No other,' telling the applicant that that was the proper answer to be made, it could not be doubted that the company would be estopped to say that insurance in co-operative companies was insurance of the kind the question referred to, and about which it desired information

before consummating the contract. The same result must follow where negotiations for insurance are had, under like circumstances, between the assured and one who in fact, and by force of the law of the state where such negotiations take place, is the agent of the company, and not in any sense an agent of the applicant. * * * In view of the statute and of that understanding upon the faith of which the assured made his application, paid the first premium, and accepted the policy, the company is estopped by every principle of justice from saying that its question embraced insurance in co-operative associations. The answer, 'No other,' having been written by its own agent, invested with authority to solicit and procure applications, to deliver policies, and, under certain limitations, to receive premiums, should be held as properly interpreting both the question and the answer as to other insurance."

The subheading of that part of the application in the case at bar, wherein is contained the answers to which plaintiff herein excepts, is as follows:

"The answers to the questions on this page must be written by one of the company's examiners. (Note. The examiner will ask the person to be insured the following questions, and will see that the answers are free from ambiguity, and that diseases are distinguished from mere symptoms.)" etc.

As bearing on the possible force of this direction of plaintiff, which imposes on the medical examiner the duty of determining what answers are proper answers to be written in the application to the questions propounded to applicant, the following extract from Chamberlain's Case, supra, is highly instructive:

"It is true that among the 'Provisions and Requirements,' printed on the back of the policy, is one to the effect that the contract of the parties is completely set forth in the policy and application, and 'none of its terms can be waived except by an agreement in writing, signed by the president or secretary of the company, whose authority for this purpose will not be delegated.' But this condition permits—indeed, requires—the court to determine the meaning of the terms embodied in the contract between the parties. The purport of the word 'insurance' in the question, 'Has the said party any other insurance on his life?' is not so absolutely certain as in an action on the policy, to preclude proof as to what kind of life insurance the contracting parties had in mind when that question was answered. Such proof does not necessarily contradict the written contract. Consequently the above clause, printed on the back of the policy, is to be interpreted in the light of the statute and of the understanding reached between the assured and the company by its agent when the application was completed, namely, that the particular kind of insurance inquired about did not include insurance in co-operative societies."

In the case at bar, the facts with reference to the questions propounded were fully and truthfully made known to the agents of the plaintiff company, and the answers written were written by such agents and assented to by defendant's signature after the intent, purpose, and scope of the questions had been announced by plaintiff's said agents. Defendant's manifest good faith in the matter, his sincere and persistent attempts to have the facts fully and truthfully presented to the company, and his reliance on the construction given to the questions propounded as the same were construed for him by the agents, bring the case at bar within the reasoning of the Chamberlain Case.

Lastly, counsel for plaintiff insist that the ruling idea underlying the Wilkinson, Mahone, Chamberlain, and similar cases is that, as the companies have during the lifetime of the assured accepted the premiums, and the assured has relied during his lifetime on the

indemnity contract provided in the policies, the company, after the death—the loss contemplated in the contract—has occurred, are estopped from avoiding the policy; since, to use the language of the North Carolina supreme court, in Bergeron v. Banking Co., 15 S. E. Rep. 883, this "would be to lend the sanction of the law to a palpable fraud." And thereupon the argument of counsel follows:

"In the case at bar the company has tendered back the premium without delay, and during the life of the policy holder, and is seeking to restore him, as well as the company, to his original condition."

It may be pertinent here to notice that the evidence shows, and the arguments at the hearing conceded, that defendant was at the institution of this action in such physical condition that he was no longer an insurable risk; that is, he could not then present such a physical condition as would be requisite to enable him to obtain desirable insurance upon his life in any reputable company. So far as defendant is concerned, his condition, looking at his insurance alone, could scarcely have been brought more forcibly within the reasons on which plaintiff claims the doctrine of estoppel rests. Let decree be entered finding the equities with defendant, and dismissing bill herein, at plaintiff's costs.