## KLEIN v. GLOBE & RUTGERS FIRE INS. CO. OF NEW YORK CITY.

(Circuit Court of Appeals, Third Circuit. September 30, 1924.)

No. 3130.

**1. Insurance ⊚⇒665(3)—Vessel held seaworthy at commencement of voyage.**

A vessel *held* seaworthy at the commencement of the voyage for which she was insured.

**2. Insurance ⊚⇒392(6) — Acceptance of premium after loss held to estop insurer to deny seaworthiness of vessel when insured.**

An insurer of a vessel, which demanded and received a part of the premium after she had sunk, with knowledge of the fact, *held* estopped to set up the defense that she was unseaworthy at the commencement of the voyage.

**3. Insurance ⊚⇒403—"Perils of the seas" insured against may vary with character of vessel.**

Under a policy insuring an upper river steamboat for a voyage down the Mississippi to New Orleans, and from there in tow, down the river and across the Gulf to Tampico, for which a higher premium than usual was paid, the rule as to "perils of the seas" insured against is not the same exactly as applies to seagoing vessels, but the implied warranty of insured was that the boat was seaworthy to the extent of being able to withstand all ordinary perils of navigation on the upper river, and the perils of the seas against which she was insured were such perils as would be extraordinary to a vessel of her type.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

**4. Insurance ⊚⇒646(6)—That sinking of vessel, though seaworthy, was caused by sea perils, not presumed.**

Even though a vessel is shown to have been seaworthy immediately prior to sinking, no presumption exists that the water entered her hold as the result of a sea peril.

**5. Insurance ⊚⇒471 — Marine policy covers losses from latent injuries.**

A marine policy covers, not only those losses that result from injuries caused by extraordinary action of the perils insured against, which became immediately known, but such, also, as result from latent injuries.

**6. Insurance ⊚⇒403—Sinking of insured vessel held due to "perils of the sea."**

The sinking of an upper river steamer, after being towed down the Mississippi from New Orleans, *held* due to strains from meeting heavy swells, which were extraordinary to it, and injury from a log which was caught between it and a barge alongside, which constituted perils of the sea, within its insurance policy.

**7. Insurance ⊚⇒468—Actual total loss of vessel.**

A sunken vessel is not an actual total loss, where there is hope of its recovery in specie at any cost.

**8. Insurance ⊚⇒469—Policy may limit right to abandon vessel as constructive total loss.**

A provision in a marine policy on a vessel that there shall be no recovery for a constructive total loss, unless the expense of recovering and repairing the vessel shall exceed the insured value, is valid and enforceable.

**9. Insurance ⊚⇒470 — Abandonment condition precedent to recovery for constructive total loss.**

Before insured can recover for a constructive total loss, he must abandon all his interest in the vessel to the insurer.

**10. Insurance ⊚⇒470—To authorize abandonment, vessel must be actual or constructive total loss.**

To entitle the owner of a sunken vessel to abandon her to the insurer, the cost of raising and repairing her must, in all reasonable probability, be such as to constitute a constructive total loss.

**11. Insurance ⊚⇒470—Duty of owner to determine cause and extent of loss.**

It is the duty of the owner of a sunken vessel to make a prompt and adequate investigation to determine the cause of sinking and the possibility and cost of raising and repairing it, and he cannot, by abandoning it, cast the burden of such investigation on the insurer.

**12. Insurance ⊚⇒665(4)—Sunken vessel held not constructive total loss.**

The owner of a sunken vessel *held*, under the evidence, not entitled to abandon her and recover for a constructive total loss.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Robert M. Gibson, Judge.

Suit in admiralty by John F. Klein against the Globe & Rutgers Fire Insurance Company of New York City. From the decree, libelant appeals. Affirmed.

The following is the opinion of Gibson, District Judge in the court below:

"The libelant seeks to recover from the respondent the sum of $85,000 upon a policy of marine insurance. The undisputed material facts of the case are substantially as follows:

"On June 25, 1921, the libelant obtained a policy of insurance upon a river boat called the Tornado, subject to the approval of respondent's surveyor, which libelant intended to take from Paducah, Ky., to Tampico, Mexico. By the terms of the application and the original policy, the boat was to go on her own bottom from Paducah to New Orleans, and there placed upon a sea-going barge to be towed by a tug to Tampico. At the instance of the respondent, which was influenced by the advice of its surveyor, a rider was added to the policy, whereby the Tornado was to be towed from New Orleans upon its own bottom, instead of upon a barge as first contemplated. At the time the original policy was modified by the rider, an additional premium of $1,275 was required by the respondent.

"Prior to August 29, 1921, the Tornado was bulkheaded and otherwise prepared, under the supervision of agents of the respondent, for her voyage to Tampico. On

August 31, 1921, it left New Orleans under tow and arrived at Pilot Town, at the mouth of the Mississippi river, about 10:30 o'clock a. m. About 1 o'clock p. m. the boat was inspected and found to be apparently all right; but about 5 o'clock p. m. it was noticed that it was listing, and an examination disclosed considerable water in its hold. The crew of the tug was notified by the two watchmen on the boat, but despite all efforts to pump it out the water gained, and the Tornado sank at about 9 p. m. in some 33 feet of water. Its smokestacks and pilot house were not entirely submerged. The respondent was promptly notified of the accident by the libelant, and on September 13, 1921, caused the wreck to be examined by a surveyor and a diver. The result of this examination was not formally presented to libelant prior to the beginning of this action. The libelant, directly and through others, after September 13, 1921, sought to learn respondent's attitude in the matter of the insurance, but the latter made no reply until about January 7, 1922, when, in substance, it refused to pay the amount of the policy.

"On October 30, 1921, the libelant filed formal proof of loss, attaching thereto two protests, one an amplification of the other, of the captain of the towing tug, and statements of the officers of the tug and of the watchmen on the boat. By the paper filed libelant claimed a total loss of the vessel, and requested payment of the entire amount of the insurance money.

"In the latter part of December, 1921, the libelant informed the respondent that he proposed to abandon the wreck on December 28, 1921, unless some instruction to the contrary was received from the latter; and, not having received such instruction, libelant ceased to assume any responsibility in connection with the sunken boat. The 'abandonment' mentioned perhaps requires some explanation, as the libelant claims that he, so far as it is essential in this case to establish the fact, abandoned the wreck to the insurer when he filed his formal claim for a total loss on October 30, 1921. From the date of the wreck until December 28, 1921, the libelant had maintained a light upon the Tornado, in obedience, as he explained, to the requirements of an act of Congress. Act March 3, 1899, 30 Stat. 1152 (Comp. St. § 9920). By his letter of December 20, 1921, libelant notified respondent that he proposed to abandon the wreck and to cease putting a light upon it on December 28, 1921.

"On December 21, 1921, the respondent, having previously made demand therefor from the brokers who had placed the insurance with it, accepted libelant's check for a part of the premium due. On January 7, 1922, by letter to the libelant, it first broke its silence in relation to the wreck. In that letter it held the proofs of loss submitted by libelant to be insufficient to show that the Tornado had sunk as a result of any of the perils mentioned in the policy, and declared its belief that it could be raised. Within a short time after the receipt of this letter, the libel was filed in the present action.

"In the instant case the court is required to determine (1) whether the Tornado was seaworthy at the beginning of the voyage contemplated in the contract of insurance; (2) whether its sinking was caused by a peril of the sea or other peril covered by the policy; and, if the issues just mentioned are found in favor of the libelant, (3) the extent of the loss. Other issues raised by respondent's answer have been abandoned. Among them may be mentioned the contention that the voyage was not begun within the period specified by the policy, and that the vessel was not towed in accordance with the requirements of the contract. Also, it is admitted that respondent's contention that Booker & Kinnaird, insurance brokers, were not agents of the respondent, is immaterial, in view of the admission of the execution of the policy of insurance.

[1] "As stated, our first inquiry relates to the seaworthiness of the Tornado at the beginning of the voyage. It is beyond question that an implied warranty and condition of seaworthiness on the part of the libelant is to be read into the contract of insurance. If the vessel was not seaworthy when it left Paducah, the libelant should not recover herein. To establish its claim in this respect, the respondent called a number of witnesses, who claimed to be, and some of whom undoubtedly were, employés on or about the Tornado, either before it left Paducah or on the voyage from that point to New Orleans. These witnesses testified that the vessel was in very poor shape. It was alleged, inter alia, that the seams in its hull were so open that daylight could be seen through them by persons standing in its hold, and that it had to be pumped very frequently in order to keep it afloat. The necessity for constant pumping was particularly urgent on the journey from Paducah to New Orleans, according to several of respondent's witnesses. Several of these witnesses, however, exhibited considerable an-

imosity toward the libelant (and these were active in procuring the other witnesses), and none of them impressed one who saw and heard them as being possessors of either great mental powers or of high moral standards.

"As opposed to them libelant called a considerably larger number of witnesses, some of whom were superior in appearance, at least, to those of the respondent. Some of these were employés of the libelant; others were engaged in various river activities and businesses. These testified that they had examined the hull and other parts of the Tornado at the time, or shortly before, it left Paducah, and that the vessel had been repaired extensively a few months before its departure and was entirely seaworthy. Chief among libelant's witnesses were Capts. G. H. and A. E. Wilson (not related), whose approval of the boat and the equipment of it for the voyage were required by the insurance contract. Each of them testified that he had carefully examined the Tornado, both at Paducah, before its departure, and at New Orleans, on August 31, 1921, and had found it fully equipped and entirely seaworthy. In view of all the testimony offered, we are of opinion that the respondent has failed to establish its claim that the Tornado was unseaworthy when it began its voyage. The great weight of the evidence is to the contrary.

[2] "Although we so find, it is perhaps unnecessary to do so, under all the circumstances. The respondent, by accepting the payment of a part of the insurance premium as late as December 21, 1921, is estopped from setting up the defense, as we think. If it had been the victim of fraud in respect to the condition of the boat, and the policy was void by reason of it, it was its duty to repudiate the contract promptly and to do nothing which tended to a recognition of it. Respondent had no right to deny any liability under the contract while accepting the benefits of it.

[3] "In addition to the claim that the Tornado was unseaworthy when the voyage begun, respondent has set out as a defense the proposition that the vessel was not lost as a result of any of the perils mentioned in the contract of insurance. An examination of the record will disclose that a decision difficult of attainment is required in connection with this defense. It is beyond dispute that the burden is upon the libelant, in a suit upon a marine insurance policy, to establish the fact that his vessel was lost or injured as a result of one of the perils contemplated by his contract. The policy issued by the respondent, in so far as it directly relates to the subject under discussion, reads as follows:

" 'Touching the adventures and perils which the said assurers are contented to bear and take upon us, they are of the seas, * * * and of all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damages of said ship, etc., or any part thereof.'

" 'This insurance also specially to cover (subject to the free of average warranty) loss of or damage to hull or machinery * * * through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the ship,' etc.

"What are the 'perils of the seas' contemplated in the policy? In their excellent and exhaustive brief, counsel for the respondent have undertaken to answer the query by the citation of a number of cases wherein the term is defined. Nearly all, if not all, of those cases had as subject-matter policies of insurance upon sea-going vessels, and while we adopt the underlying principles which led to the definitions, we cannot accept the literal definitions because of the variation between the underlying facts of the instant case and those of the cases cited. In arriving at the meaning of the terms in the present policy, we must keep in mind the kind of boat insured, the voyage contemplated, and the nature of the risk assumed. The Tornado was an upper river steamboat, which, under the terms of the policy, was to be towed over the Mississippi below New Orleans and a part of the Gulf of Mexico, waters which it was not designed to regularly traverse. By the original terms of the policy the boat was to be taken to Tampico upon a sea-going barge, but a rider was added to the contract, at the instance of the respondent, by which this provision was changed, and the vessel was towed upon its own bottom. By the change the insurer assumed a greater risk, and the insured paid a higher premium. Under the circumstances it cannot be claimed that the libelant impliedly warranted the boat as seaworthy to the extent of being able to withstand all winds and waves in the lower river and the Gulf of Mexico, except such as were extraordinary. On the other hand, the contract, in our opinion, was not one of guaranty on the part of the respondent that the boat would safely make the voyage, as claimed by libelant. The implied warranty of the libelant was that the boat was sea-

worthy to the extent of being able to withstand all ordinary perils of navigation upon the upper river, and the 'perils of the seas' against which it was insured were such perils as would be extraordinary to a boat of its type.

[4, 5] "Our immediate duty is to determine whether the record shows that the Tornado's misfortune was occasioned by any such extraordinary peril. In this connection it is to be noted that, even though a vessel is shown to be seaworthy immediately prior to sinking, no presumption exists that the water entered its hold as a result of a 'sea peril.' The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748. But, on the other hand, the policy will cover, not only those losses that result from injuries caused by extraordinary action of the perils insured against which become immediately known, but such also as result from latent injuries. Stephenson v. Pascataqua F. & M. Ins. Co., 54 Me. 55.

[6] "The Tornado, according to the weight of the testimony, left New Orleans without any water in its hold. It arrived at Pilot Town without having taken any considerable amount, but several hours after arrival was noticed to be listing, and examination disclosed that it was leaking badly, and later sank, despite all proper exertions of the crew in charge. On the trip from New Orleans to Pilot Town, upriver winds and swells were encountered. The wind was not so strong as to suggest the existence of a tempest, but the swells created were such as to give the boat 'a good shaking up.' The watchmen on board have testified that at one stage of the journey from New Orleans to Pilot Town, for a period of about half an hour, the Tornado underwent considerable strain. 'She seem to hit something,' 'she kept bucking' (jumping up and down), were expressions used to describe the action of the boat. One watchman, Reid, has testified that while this 'bucking' was going on he took his flashlight and went over the boat to determine the cause, and while doing so saw a log come out on the port side under the vessel's guard. It will be remembered that the boat was joined to the barge Ashland on that side, and the space between the hulls was a foot—perhaps a few inches more.

"Counsel for the respondent has forcibly attacked this testimony of the watchmen as incredible, and has pointed out that neither of them mentioned a log in affidavits made by them shortly after the misfortune of the

Tornado, nor did either of them report it to the captain in charge of the tow upon arrival at Pilot Town. In an affidavit made September 14, 1921, Libelant's Exhibit 63, Brandhorst said: 'The wind and swells were so heavy coming down that I believe we struck something.' In an affidavit made on October 25, 1921, Reid said: 'We may have hit something coming down, as the winds and swells were heavy. This is the best explanation that I am able to give.'

"The absence of specific mention of the log incident in the early affidavits is undoubtedly a matter for notice, and were there no supporting evidence, we should perhaps be justified in ignoring this part of the testimony of the watchmen by reason of it. There is such supporting evidence, however, and that evidence in itself very strongly tends to show that the Tornado met her fate from a peril of the river rather than from inherent unseaworthiness. In his deposition J. G. Sanford, the diver, called by the respondent, who examined the wreck on September 13, 1921, said: 'Well, I found her in good condition; the only thing—I examined her from stem to stern, and the only thing I found was two or three pieces of sheeting, from the stern to right about her midships, as far as I could judge, two or three feet, that was pulled four or five feet away by a log or something striking her; but the inside of the boat didn't seem to be damaged at all.'

"The captain of the tug Richmond, who examined the hold of the Tornado shortly before it sank, stated that he noticed that the vessel had opened a seam on its port side, and had several leaks in the stern; but he saw no split in her planking, which, of course, is not an essential element of a sinking on account of a 'peril of the seas.'

"As we view the evidence, it establishes as a fact that the Tornado sank as a result of a 'peril of the seas'; that between New Orleans and Pilot Town it met swells which were extraordinary to it, and the effect of these swells, increased by a log caught between it and the barge, loosened its caulking, which gradually dropped out, admitting the water through the seams so created in the hull.

[7] "The next matter for consideration is the extent of the damage to the boat and the consequent amount of compensation the libelant is entitled to recover. Libelant has claimed that the evidence shows the boat to be not merely a constructive, but an actual, total loss. This claim is without any real merit. An actual total loss does not exist,

where a hope exists for the recovery of the vessel in specie at any cost. That such a hope of its recovery existed for several months after the Tornado sank is beyond dispute, even though we accept the theory of the libelant that it was broken in two. The break claimed was not a total separation of one part of the boat from the other. Even boats broken in two have been raised from the Mississippi, as appears from the evidence. In the instant case, the boat sank in some 33 feet of water, and undoubtedly could have been raised and repaired. The cost of such action is quite another question.

[8] "Libelant also claims the right to recover the full amount named in the policy on the ground that his vessel was a constructive total loss. By this claim a number of questions have been raised: First, what amount of damage to his vessel is necessary before the libelant is entitled to claim a constructive total loss? In regard to this matter the policy contains the following provisions: 'No recovery for a constructive total loss shall be had hereunder, unless the expense of re-recovering and repairing the vessel shall exceed the insured value.'

"Under above provision, if the Tornado could have been raised and repaired at a cost of less than $85,000, libelant had no right to claim a 'constructive total loss. While claiming such repair would cost more than $85,000, libelant contends that above provision is at variance with the substantial purposes of the policy as a contract of indemnity, and in conflict with the American and English rules as to constructive total loss, and is therefore void. He further contends that the American rule as to a constructive total loss (50 per cent. of the value of the vessel) be applied.

"We are unable to agree with the foregoing proposition. There is no reason, as we see it, why an insurance policy should not contain limitations upon the right to abandon and claim a constructive total loss.

[9] "Another matter for preliminary discussion is the sufficiency of libelant's abandonment. It is a primary rule that, before the insured can recover for a constructive total loss, he must abandon all his interest in the vessel to the insurer. This the libelant herein did, in a more or less informal way, on December 21, 1921. Libelant claims a sufficient abandonment, however, by his claim for a total loss filed with respondent on October 31, 1921. In this claim no mention of abandonment was made. From the view that we have relative to libelant's claim of the right to abandon, which we shall later discuss, we are not called upon to decide whether a claim of a total loss is an abandonment or its equivalent. Nor are we required to pass upon respondent's contention that libelant's abandonment, whether considered to be on October 31 or December 21, 1921, is invalid as not having been made with sufficient promptness after the wreck, although it might under other circumstances be a matter for serious thought.

[10] The testimony introduced in the instant case has convinced us that the libelant had no right, under his contract, to abandon the vessel to the respondent and recover for a constructive total loss. The general principle by which a right to abandon a vessel to the insurer (under the American rule of 50 per cent.) is set forth by Mr. Justice Story in his opinion in Bradlie v. Maryland Insurance Co., 12 Pet. (37 U. S.) 378, 398 (9 L. Ed. 1123), as follows: 'Under such circumstances, if, in all human probability, the expenditures which must be incurred to deliver her from her peril are at the time, so far as any reasonable calculations can be made, in the highest degree of probability, beyond half value, and if her distress and peril be such as would induce a considerate owner, uninsured, and upon the spot, to withhold any attempt to get the vessel off, because of such apparently great expenditures, the abandonment would doubtless be good.'

[11] "It is the duty of the insured, as we conceive it, to make a prompt and adequate investigation, both to determine the cause of his vessel's misfortune and the possibility and cost of raising and repairing it. If such investigation satisfied him that it sank by reason of one of the perils insured against, and that it would cost more than its value to raise and repair it, he had the right, provided he acted promptly, to abandon his interest in the vessel to the insurer. It goes without saying that the insured is not required to raise and repair the vessel, to determine whether or not the cost would amount to more than the amount that would constitute it a constructive total loss; and, on the other hand, he is not entitled, without investigation and without due foundation of fact or extreme probability of fact, to place the entire burden upon the insurer by an abandonment. He must determine for himself whether he has the right to abandon. If he is able to show that the cost of restoring the vessel, 'so far as any reasonable calculations can be made,' would exceed the amount which would constitute it a constructive total loss, he is safe in abandoning

it; but it must be remembered the existence of the fact that it would so exceed the amount, constituting a constructive total loss, is the criterion of his right to abandon.

"In the present case the libelant seems to have misapprehended his own burdens in the premises, as well as those of the respondent. After the Tornado sank, the libelant promptly notified the respondent of the fact, and the latter sent its surveyor to the scene of the wreck on September 13, 1921, with a diver. In passing, we notice the contention of libelant that such action constituted an assumption of possession on the part of respondent, and that thereafter he (libelant) was powerless to proceed until respondent had announced its position as to the wreck. Having in mind the provisions of the contract, and the fact that abandonment had not been tendered at the time, we are of opinion that there is no merit in the claim. After the examination of the wreck by the surveyor and the diver, the libelant sought to learn from the respondent or its agents, almost to the point of importunity, the attitude of the insurer in respect to the insurance and the wreck. He asked respondent more than once what it intended to do, and what it wanted him to do. To his communications the respondent made absolutely no reply. Its silence in the matter has had no tendency to attract sympathy towards it. It may have been discourteous, and even unwise and impolitic, in the premises; but we are unable to say that it did not have the right to remain silent, because it was, in fact, libelant's 'turn to move.'

"Had libelant, immediately after the sinking, tendered abandonment of the vessel and filed proof of a claim for a total loss, respondent's failure to answer might possibly have been construed as an acceptance of abandonment; but the libelant filed no formal claim for two months, and made no specific abandonment of the vessel for almost four months, and under such circumstances, while respondent's silence may not have been golden, it caused the loss of none of its rights. Before abandonment, the respondent, while empowered to take certain steps for the salvaging of the vessel, was required by its contract to do nothing. After abandonment—assuming it to be valid —it had several courses open. It could have accepted the abandonment and paid the full amount of the insurance, or it could have repaired the vessel and have turned it over to the insured, or it had the right to allow the boat to remain on the bottom of the river and contest the right of the libelant to abandon it as a constructive total loss. The last-named course has been adopted.

[12] The right of the libelant to recover for a constructive total loss—waiving the question of delay in abandonment—depended entirely upon the establishment of his theory that the vessel had broken in two when it sank. The captain of the tug Richmond and the two watchmen, Reid and Brandhorst, who saw the Tornado sink, were called for this purpose. Mayo, the captain, and Brandhorst, testified in substance that the boat, which had listed at the stern, straightened up as its hold filled, until it was flat on its bottom, and then sank with a loud crash. Reid's testimony was to the effect that the boat raised at the stern a little and 'buckled up in the middle'; then the stern and bow went down a little bit, 'she settled a little and went right on down with a loud crash.' Each of these witnesses expressed the opinion that the vessel had broken in two. In addition to the three persons mentioned, who were eyewitnesses of the sinking, the libelant was allowed to put a hypothetical question, in which was included Reid's description of the sinking, to several rivermen of many years' experience, who testified that the facts stated would indicate that the boat had broken in two. Each of these same witnesses and another riverman of great experience, called by the libelant, on cross-examination, stated in effect that it was his custom, where a boat was under water, to have it examined by a diver before advising or determining whether or not to raise it.

"The respondent had the sunken boat examined twice by divers, first by J. G. Sanford on September 13, 1921, and again by Fritz John, on August 26, 1922, almost a year after the sinking. Sanford, at the time of trial, had 21 years' experience, and John had 18 years'. Each of them testified to a careful examination of the hull, bulkheading, and decks of the boat, and stated that it was not broken in two. Sanford testified to examining only about 10 or 12 feet of the hold, in which he found no break. John testified to a complete examination of the hold, but his description of it was so inaccurate that his testimony in regard to it has been dismissed from consideration.

"The failure of the libelant to have the boat examined by a diver, in view of the ordinary practice, is a matter for remark. An explanation of it may be found in an incident which occurred when the boat was examined by Sanford, the diver. On that day, according to Mr. Sanford, who was

about to go in the water, the libelant said to him: 'If you find her broke in two there is $1,000 in it for you.' The libelant's version of the remark was: 'I will give you $1,000, Sanford, if you will find a break in this boat.' According to libelant's own testimony, the diver, after this offer, although he had been about to quit work, again entered the water and made another examination, and again reported to libelant that he had been unable to find any break. In view of this information, it would seem that libelant's failure to have the vessel examined by a diver was by reason of a fear of what the latter might find in case he were sent. In any event it is plain, from the neglect to have such an examination made, that the libelant did not act as a considerate owner, uninsured, would have acted before he would have allowed the vessel to lie at the bottom of the river.

"The testimony establishes the fact that the Tornado was not broken in two when it sank, and therefore that the libelant was not entitled to abandon it and recover the full amount of the insurance on the ground that it was a constructive total loss. The boat could have been restored for less than $85,-000.

"Under the facts herein, as hereinbefore found, the libelant is entitled to recover damages for a partial loss. The only testimony given in his behalf in regard to the cost of raising and rehabilitating the boat at New Orleans, which would be the measure of damages, is that of the libelant himself. His testimony, however, is almost entirely based on the theory that the boat was broken in two, and is so lacking in specification that it can be of little assistance to us. If we are to make any award, we must rely largely upon the testimony of the witnesses of the respondent. After a consideration of all the testimony introduced, we are of opinion that the libelant, John F. Klein, is entitled to a decree for $50,922.50, with interest from ———, and costs.

"In the computation of damages, we have not made any allowance for damage by reason of the loss of the voyage. Such damages cannot be allowed under the contract of insurance herein."

Lowrie C. Barton, of Pittsburgh, Pa., for appellant.

Reed, Smith, Shaw & McClay, of Pittsburgh, Pa., and Bigham, Englar & Jones, of New York City (George S. Brengle, of New York City, and John J. Heard, of Pittsburgh, Pa., of counsel), for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and THOMPSON, District Judge.

PER CURIAM. This is an appeal from a decree of the District Court, entered in a suit in admiralty on a marine insurance policy. The steamboat Tornado was to take a voyage from Paducah, Ky., to Tampico, Mexico, and was insured by the respondent for the voyage, the amount of the policy being $85,000. The policy provided that the Tornado should be towed or go under her own steam to New Orleans, and from there she was to be taken on deck of a sea-going barge to Tampico. She was towed to New Orleans. The policy was then twice modified by riders, which provided that the vessel should be towed on her own bottom from New Orleans to Tampico, instead of being taken on the deck of a sea-going barge, and that the vessel and all arrangements be approved by Capt. C. A. Wilson.

Arrangements were made for the tug Richmond to tow the Tornado from New Orleans to Tampico. About 10 miles down the Mississippi from New Orleans they met strong winds and swells. They continued to Pilot Town, at the mouth of the river, where they took on a Gulf pilot, who told the captain of the Richmond that the water was rough and the sea heavy in the Gulf of Mexico, and ordered the tow to anchor. The Tornado seemed to be in good condition at that time, 10 o'clock in the forenoon. At about 5 o'clock in the afternoon the Tornado was listing, and an examination disclosed that she had about 14 inches of water in her hold. Her pumps were started, and everything was done to save her that could properly and reasonably be done; but she sank at about 8:40 o'clock that evening.

The owner and the insurance company could not agree on a settlement, and the owner, claiming the boat was a total loss, brought this suit for the full amount, $85,-000, of the insurance. The case was tried to the court without a jury, and it entered a decree for the libelant for $50,922.60, with interest. The libelant has brought the case here by appeal, and contends that the loss of the boat was total, and he should have been awarded the full amount of the insurance. The respondent, on the other hand, while not appealing, contends, since this is a trial de novo, that the sinking of the boat was not due to a peril of the sea covered by the insurance policy, and that the decree should be reversed, but, if the court should think otherwise, the damages awarded were excessive, and should be reduced.

The respondent has not satisfied us that the learned District Judge did not reach the right conclusion that the boat sank by reason of a peril of the sea, against which she was insured, nor has it satisfied us that the damages awarded were excessive. On the other hand, the libelant has not borne the burden of showing that the loss was total, and that the damages awarded were inadequate. We are in accord with the conclusions of the learned District Judge, and adopt his opinion as expressing our views, and so the decree is affirmed.