## CITIZENS' INS. CO. OF MISSOURI v. BAILEY.

Circuit Court of Appeals, Eighth Circuit.
August 16, 1928.

No. 7863.

Stone, Circuit Judge, dissenting.

C. J. Roberts, of Santa Fé, N. M. (Myers & Snerly, of Chicago, Ill., on the brief), for plaintiff in error.

W. C. Whatley, of Las Cruces, N. M. (E. L. Medler, of El Paso, Tex., on the brief), for defendant in error.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. Pearl H. Bailey brought this action against the Citizens' Insurance Company of Missouri to recover the sum of $15,000 for an alleged loss under a policy of hail insurance. The insurance policy insured a crop of cotton growing on a tract of 500 acres known as the Buffalo Valley Farms, located in Chaves county, New Mexico, against loss or damage from hail. The application was executed May 24, 1926. The policy was countersigned May 27, 1926. The policy contained, among other things, the following provisions:

"1. This policy of insurance is based upon the statements, representations and descriptions contained in the insured's application of even number herewith which is hereby made a part hereof."

"4. This entire policy shall be void if the insured has concealed or misrepresented any material fact or circumstances concerning this insurance or the subject thereof; or if the interest of the insured in the crops covered hereunder be not truly stated herein; or in case of any fraud or attempted fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

The application contained, among others, the following statements:

"I hereby declare that the statement of the number of acres of each crop herein described is true; that I am the owner of the land herein described, with growing crops thereon; and my interest is as stated under the ·heading 'Percentage Interest Must be Stated.' "

"Crop insured is a 100 per cent. interest."

The policy also contained, among other things, the following provisions:

"It being understood and agreed that the liability of this company shall in no event be held to exceed the actual proportionate interest of the insured in the crops described and insured hereunder."

"That this company shall not be bound by any act or statement made to or by its agents or representatives, restricting its rights or waiving its written or printed contract unless inserted in this application."

274

"This policy is made and accepted subject to all of the stipulations and conditions printed herein and on the duplicate Application attached hereto and made a part hereof, which are hereby specially referred to and made a part of this policy, together with such other provisions, agreements, or conditions as may be endorsed hereon or added hereto; and no officer, agent, or other representative of this company shall have power to waive any provision or condition of this policy, except such as by the terms of this policy may be subject of agreement endorsed hereon or added hereto; and as to such provisions or conditions no officer, agent or representative shall have such power or be deemed or held to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached hereto."

The answer of the insurance company alleged that the plaintiff in his written application stated that he owned a 100 per cent. interest in the crop of cotton growing upon the land described in the application, and that he was the owner of such land with the growing crops thereon. It further alleged that at the time of the signing of such application and the issuance of the policy in question, P. G. Telles, Martin Espinoso, Jose Antobarias, Guadalupe Gardea, and Eliseo Arias, had valid and subsisting cropping contracts with the plaintiff, by which each of them became and were at such time an owner of an interest in the crop of cotton growing on such land, and at the time of the signing of the application and the issuance of the policy E. D. Anthony was the owner of an undivided one-half interest in the land on which the crop was growing, and was the owner of an undivided one-half interest in the crop of cotton, and that the interest of Anthony in such land and crop was in all things equal to the interest of plaintiff.

To the special defenses set up in the answer, the plaintiff alleged, among other things, the following in his reply:

"Plaintiff denies that the statement attributed to him in paragraph 9 of defendant's answer as to the ownership by him of a 100 per cent. interest in the 500 acres of cotton insured was untrue, * *. * but avers that such is and was the fact, that is, that he is and was the sole owner of a one hundred per cent. interest in said crop of cotton at the time of his application for such insurance."

" * * * That plaintiff further states that he made application for the insur-

ance herein sued for to one Merrill C. Martin who at such time was the duly appointed, qualified and acting agent of the said defendant company in Roswell, New Mexico, with jurisdiction extending over the vicinity of and including the Buffalo Valley Farm upon which the cotton insured was growing, and that at and prior to the making and signing of such application he apprised the said agent of each and every fact in connection with said crop of cotton and the ownership thereof and explained to him in detail the exact relation existing between said plaintiff and said E. D. Anthony and said plaintiff and said P. G. Telles, Martin Espinoso, Jose Antobarias, Guadalupe Gardea, and Eliseo Arias, and of their connection with said farm and the cotton growing thereon and in said application sought to be insured; (that said Anthony and said others were mere croppers and had no interest except in the proceeds after the same were harvested and all indebtedness accruing thereon paid;)" "and plaintiff therefore avers that at and before the time of the issuance of said policy of insurance in suit said defendant company had full notice and knowledge of all and every fact connected with the said cotton crop and the ownership thereof, including present vested interests, contingent interests and expectant interests; and said application was in fact prepared by the special agent, Martin."

The portion of the reply above quoted inclosed in parenthesis was added as a trial amendment.

A stipulation in writing waiving a jury was filed, and the cause came on for trial before the court.

The evidence disclosed that at the time the application was made plaintiff had entered into oral agreements with the five persons, Telles, Espinoso, Antobarias, Gardea, and Arias, to work the land on a share or crop basis. Plaintiff was to furnish them with provisions and clothing, was to sell the crops at maturity, and pay to the croppers one-half of the proceeds of such sale, less the amount of advances made by plaintiff to the croppers for their expenses.

The record further discloses that on February 17, 1926, plaintiff entered into a contract with E. D. Anthony by which plaintiff agreed to sell and Anthony agreed to purchase an undivided one-half interest in the Buffalo Valley Farms, and all personal property, equipment, and machinery, for a consideration of $30,000. The contract, after providing the terms, time, and

manner of payments to be made by Anthony, and reciting the indorsement and delivery, as collateral for certain payments, of two promissory notes made by R. C. Sparks and payable to Anthony for the sum of $5,000 each, contained the following provisions:

"6. As to any and all sums and expenditures necessary and to become necessary in operating said farm from and after this date and all sums for the proper conduct thereof from and after this date the purchaser becomes responsible and liable for one-half thereof and agrees also to devote his time and attention to the management and conduct of said business and farming operations, and out of the net proceeds derived from the crops raised upon said farm said purchaser, the party of the second part herein, shall be entitled to receive for his services in managing and looking after said farm compensation at the rate of $100 per month; and that as to all other sums derived from the crops, the same, after payment of the indebtedness, as may be mutually agreed upon from time to time, are to be divided share and share alike."

"7. Party of the first part, the seller, agrees that he will hold for the use and benefit of the purchaser an undivided one-half interest in the said Buffalo Valley Farm property, described as aforesaid, together with the equipment, pumping plant and appurtenances thereto, and will when the purchase money note maturing January 6, 1927, is paid, make, execute, and deliver to him, his heirs, executors, administrators. and assigns, good and sufficient warranty deed, conveying good and merchantable title in and to such undivided one-half interest in said property to said party of the second part. * * * "

"9. It is further understood between said seller and purchaser that they are to be tenants in common and co-owners in the operation of said property and partners only to the extent that they may become liable for any debts incurred on account of the operation of said farm."

To avoid the defenses set up in the answer, plaintiff relied upon two propositions: First, that plaintiff, at the time of the making of the application, was the owner of a 100 per cent. interest in the growing crop of cotton and in the farm; and, second, if he was not the owner of 100 per cent. interest, he made full and true disclosure of all material facts to Martin, the agent of the insurance company, that Martin prepared the written application, and upon the facts disclosed wrote into the application that plaintiff was the owner of the lands upon which the cotton crop was growing, and of a 100 per cent. interest in such crop, and that because thereof the defendant was estopped to deny the truth of such statement.

At the conclusion of the evidence the trial court made the following findings:

"2. That on the 24th day of May, 1926, plaintiff made application to said Merrill C. Martin,. as agent of said defendant company for the issuance to him of a policy of insurance covering the loss by hail of five hundred acres of cotton upon what is described in the evidence as the Buffalo Valley Farm, in Chaves county, New Mexico; *and that prior to said time, in the negotiations leading up to the formal application for such insurance, plaintiff had advised and informed said agent, Martin, that he was the legal owner of said crop of cotton,* but that in the raising of said crop he had and there was then existing certain arrangements between plaintiff and P. G. Telles, Martin Espinoso, Jose Antobarias, Guadalupe Gardea, and Eliseo Arias whereby said named parties, having already planted said crops, were to attend, care for and harvest the same and upon the sale thereof by plaintiff were to become and be then entitled to a share of the proceeds of said crops, after the reimbursement to plaintiff of all moneys which he should have advanced for their account, *and that said parties did not have and were not to have any interest in said crops as such; and that in addition thereto he then had a contract with one E. D. Anthony whereby said Anthony was ultimately to acquire an interest in the said Buffalo Valley Farm property upon the payment of certain sums of money in the month of January, 1927,* and pending such date said Anthony was to superintend the conduct of the farming operations to be carried on upon said farm under the direction and control of the plaintiff, and for his services so to be rendered in such capacity was to receive a salary of $100 per month, payable out of the proceeds of any crops raised on said farm, and after the payment out of the proceeds of said crop of the cost and expenses of making the same and certain other indebtedness, provided for in said contract, any such proceeds as might then remain were to be divided share and share alike between them; and that in addition to the facts so communicated to the said Merrill C. Martin, as such agent, and to confirm the same the said Merrill C. Martin as such agent made an independent

investigation as to the interest of the said Pearl H. Bailey in the crops then being raised upon said Buffalo Valley Farm and said property, from which information so furnished by plaintiff and that acquired by said independent investigation said agent determined that, for the purpose of insurance, plaintiff was the owner of a 100 per cent. interest in said crop of cotton." (Italics ours.)

From the foregoing facts, the court concluded as a matter of law as follows:

"And upon the foregoing facts the court concludes as a matter of law that at the time of the making of the said application for insurance and the issuing of the policy upon the said crop of cotton to the said plaintiff by the defendant company, the plaintiff was then the legal owner and had an insurable interest in the property insured to the extent of 100 per cent. thereof."

The court further found there was a total loss under the policy amounting to $12,837.62, and gave judgment therefor, with interest. This is a writ of error from that judgment.

█ Whether the croppers were to have a present vested interest in the growing crop of cotton and were tenants in common as to such crop with the plaintiff, depends upon the intention of the parties to the cropping contract. Underhill v. Allis-Chalmers Mfg. Co. (C. C. A. 8) 15 F.(2d) 181, 183, 184. However, in view of our conclusion as to the legal effect of the contract with Anthony, we find it unnecessary to determine the interest, if any, of such croppers in the growing crop of cotton.

The written contract entered into between plaintiff and Anthony on February 17, 1926, was unconditional. It absolutely bound the plaintiff to sell and Anthony to purchase. Anthony put up collateral security to secure certain deferred payments. Anthony went into joint possession and management of the property with plaintiff. There was no reservation of crops to the plaintiff. Paragraph 7 expressly recited that the plaintiff "agrees that he will hold for the use and benefit of the purchaser [Anthony] an undivided one-half interest in the said Buffalo Valley Farm property together with the equipment, etc." Paragraph 9 recites that the relation of plaintiff and Anthony was that of tenants in common and co-owners.

In the case of Phenix Ins. Co. of Brooklyn, N. Y., v. Kerr (C. C. A. 8) 129 F. 723, 726 (66 L. R. A. 569), the court said:

"If the owner has agreed to sell and the vendee has agreed to buy on definite terms, the purchaser is the sole and unconditional owner of the property within the true meaning of the clause upon this subject in insurance policies, because the vendor can compel the purchaser to pay for the property notwithstanding its injury or destruction, and hence to suffer the loss occasioned thereby. Milwaukee Mechanics' Ins. Co. v. Rhea & Son (C. C. A.) 123 F. 9, 11, 13 Am. & Eng. Ency. of Law (2d Ed.) 178, 179, and cases cited; Hough v. City Ins. Co., 29 Conn. 10, 76 Am. Dec. 581; Rumsey v. Phœnix Ins. Co. (C. C.) 1 F. 396; Amsinck v. American Ins. Co., 129 Mass. 185; Wainer v. Milford Fire Ins. Co., 153 Mass. 335, 26 N. E. 877, 11 L. R. A. 598; Redfield v. The Holland Ins. Co., 56 N. Y. 354, 15 Am. Rep. 424; Pelton v. Westchester Ins. Co., 77 N. Y. 605; Dupuy v. Delaware Ins. Co. (C. C.) 63 F. 680."

See, also, Waller v. City of New York Ins. Co., 84 Or. 284, 164 P. 959, 961, Ann. Cas. 1918C, 139; Insurance Co. of N. America v. Erickson, 50 Fla. 419, 39 So. 495, 111 Am. St. Rep. 121, 7 Ann. Cas. 495; note 2 L. R. A. (N. S.) p. 512

█ We think there can be no doubt under this contract that Anthony acquired at the time of the execution and delivery of the contract the equitable title to an undivided one-half interest in the land and the growing crop of cotton. It follows that the statement in the policy that plaintiff was the owner of a 100 per cent. interest in the land and the crop of cotton was false and rendered the policy void and non-enforceable (Rochester German Insurance Co. v. Schmidt (C. C. A. 4) 162 F. 447; Fidelity Union Fire Ins. Co. v. Kelleher (C. C. A. 9) 13 F.(2d) 745; Syndicate Ins. Co. v. Bohn (C. C. A. 8) 65 F. 165, 27 L. R. A. 614), unless defendant under the facts and circumstances is precluded from asserting such defense.

█ Such statement constituted a warranty, and, if false, it is wholly immaterial that plaintiff may have made it in good faith and honestly believed it to be true. Rochester German Ins. Co. v. Schmidt, supra; Fireman's Fund Ins. Co. v. Barker, 6 Colo. App. 535, 41 P. 513; Geiss v. Franklin Ins. Co., 123 Ind. 172, 24 N. E. 99, 18 Am. St. Rep. 324; Wilbur v. Bowditch Mut. F. Ins. Co., 10 Cush. (Mass.) 446; 26 C. J. § 208, p. 171; 32 C. J. § 520, p. 1293.

Counsel for the plaintiff insist that the defense of estoppel was made out and strongly relied upon the decision of the Supreme Court in Continental Life Ins. Co. v. Chamberlain, 132 U. S. 304, 10 S. Ct.

87, 33 L. Ed. 341, and section 41 of chapter 135, 1925 Session Laws of New Mexico, which statute provides that any person licensed as an agent to represent an insurance company shall in any controversy between the insured and the company be held to be the agent of the company issuing the insurance.

In order to bring himself within the principles of Insurance Co. v. Chamberlain, supra, plaintiff must have established that he made a true, full, and fair disclosure of all the material facts to the agent, and that the agent made out the application, and in filling in the answers to the questions therein contained placed his own interpretation upon the facts stated by plaintiff.

We entertain doubt that upon the record as a whole the trial court would have been warranted in finding that plaintiff made a full and complete disclosure to Martin, the agent of the insurance company.

Plaintiff testified, referring to the croppers, "They didn't have an interest in the crop until it was made, under our agreement." He further testified: "My understanding with the Mexicans and with Anthony was that they had no interest in the crops, only in the proceeds thereof." In testifying with reference to his statement in the proof of loss that he owned a 100 per cent. interest in the crop, he said: "Yes, sir, because I believed my interest was 100 per cent." He further testified: "I did not consider him [Anthony] as a partner until he had paid me what he agreed to pay as the first payment on that farm." He further testified that he told Martin that the contract was in escrow, and that he was solely responsible for the money borrowed to finance the crop. It will be noted that the contract by its express terms made Anthony liable for one-half of the money so borrowed. The contract was not in escrow, but was deposited with the First National Bank of Roswell as collateral for a loan. Plaintiff further testified: "I told Mr. Martin that I was the owner of the Buffalo Valley Farms."

Martin, the agent of the defendant, called as a witness for the plaintiff, testified that he made out the written application; that "Mr. Bailey told me about his farm foreman, who at some time would acquire an interest in the place on the execution of certain conditions and agreements, but that there was no recorded interest other than his own." Martin further testified that plaintiff stated that he "was the legal owner of the farm and the crop"; that the contract with Anthony was in escrow; that Anthony would acquire no title or interest in the place until somewhere about the first of the year 1927, and then only upon the execution of certain conditions and the making of certain payments. Martin further testified that he made inquiry at the First National Bank of Roswell, and that the vice president of the bank told him the bank held the contract in escrow, and that plaintiff was the owner of the land and the crop. Martin's evidence was not denied.

We think the evidence construed in a light most favorable to plaintiff compels the conclusion that plaintiff believed, at the time the application for the insurance was made, that Anthony had no present interest in either the farm or the cotton crop. If such was plaintiff's belief, it is very improbable that he stated facts which would indicate the contrary to the agent Martin. Martin's testimony indicates that plaintiff represented to Martin that Anthony had no interest in either the land or the cotton and would acquire no interest in the land until January, 1927.

We are therefore of the opinion that it is a fair conclusion from the whole record that Bailey believed, at the time the application for the insurance was made, that Anthony had no interest in either the land or the crop, and that he so stated the facts to the agent Martin.

■■ However, if the evidence would sustain a finding that the plaintiff made a true, full, and fair disclosure of the material facts to the agent, and that the agent placed his own construction upon such facts, and wrote into the application that plaintiff was the owner of a 100 per cent. interest in the crop, the reply did not plead and the court did not find, that such were the facts. It is true that the reply as originally drawn did allege in general the language that plaintiff apprised the agent of all the facts, but on the trial objection was made to these general allegations and plaintiff made a trial amendment in which he descended to particulars and alleged that what he told the agent was that Anthony and the others were mere croppers, and had no interest, except in the proceeds after the crops were harvested and sold, and all the indebtedness accruing thereon paid.

The court, in his findings of fact, specifically found that plaintiff advised the agent, Martin, "that he was the legal owner of said crop of cotton"; that he had a contract with Anthony whereby Anthony "was ultimately to acquire an interest in the

Buffalo Valley property upon the payment of certain sums of money in the month of January, 1927.'' This is in effect an affirmative finding that plaintiff did not disclose the true facts to the agent. If there could be any doubt as to this from the language of the finding, it is set at rest by the court's conclusion of law that plaintiff in fact did own a 100 per cent. interest in the crop of cotton at the time the application for the insurance was made.

By its requests for findings of fact and declarations of law, and by exceptions preserved to rulings thereon, the defendant insurance company fully preserved its right to have reviewed the questions we have considered.

We therefore conclude that neither the pleadings nor the findings of the trial court supported the defense of estoppel. It follows that the judgment was erroneous, and the cause is therefore reversed, with instructions to grant the defendant a new trial.

STONE, Circuit Judge (dissenting). It is obvious, from the portions of the policy quoted in the majority opinion, that a true statement of the insurable interest in the crops was a condition precedent to liability on the policy. The statement of the insured therein was that he owned 100 per cent. of the crops. Therefore no recovery can be had if the evidence clearly shows that the insured's interest was not as stated, unless the insurer is estopped to insist upon these requirements of the policy. There is a serious contention between the parties as to whether the evidence does or does not show the ownership stated. The trial court concluded that it did. However, if the claim of estoppel is well taken, we need not determine such ownership, but may, for the purpose of determining the estoppel, take it that such statement was inaccurate.

I. The insurer contends that there can be no waiver nor estoppel because its agent had no authority to make any waiver nor to do anything which would have the effect of creating an estoppel to any provision of the policy. It is true that the policy contained the standard provisions as to waiver and I think these are sufficient to deprive the agent of all power to waive any provisions of the policy. However, these provisions, nor any others, are sufficient to protect the insurer from avoiding some character of acts of its agent which are acted upon by the insured in good faith.

The form of application for an insurance policy and the policy itself are usually, as in this case, instruments very carefully prepared by the insurer who chooses the expressions set forth therein. It may employ terms which are ambiguous in meaning. Such ambiguity may exist in the words themselves or it may arise from the application of such words to particular risks offered for insurance. Where the ambiguity exists in the words themselves, the law construes such words in favor of the insured to mean what he did and might reasonably have believed they meant. This is a rule of construction applied in general to contracts drawn by one party and is not peculiar to insurance contracts. Where the ambiguity arises from applying words of a policy (fairly clear in themselves) to some particular state of facts involved in a contemplated risk, the representative of the insurer in that transaction may bind the insurer by an *honest* construction of meaning which is *honestly* accepted by and acted upon by the insured. This does not mean that the agent can change a word of the policy from its clear meaning or that an insured would be heard to contend that he accepted and acted upon a meaning which was clearly foreign to the words used. It means that where there is room for and there exists a reasonable doubt as to the application of such words to a set of facts the judgment of the insurer's representative thereon may in that transaction be safely, if honestly, accepted and acted upon by the insured. To hold otherwise would be a fraud upon the insured. Usually, the insured is unversed in insurance matters. They come into his affairs infrequently. On the other hand, the agent of the insurer is experienced in and familiar with such matters and particularly with the contracts in which he is dealing. The above rule is stated in McMaster v. N. Y. Life Ins. Co., 183 U. S. 25, 38, 22 S. Ct. 10, 46 L. Ed. 64; Continental Life Ins. Co. v. Chamberlain, 132 U. S. 304, 10 S. Ct. 87, 33 L. Ed. 341; Eames v. Home Ins. Co., 94 U. S. 621, 629, 24 L. Ed. 298; American L. Ins. Co. v. Mahone, 21 Wall. 152, 155, 156, 22 L. Ed. 593; Pac. Mut. Life Ins. Co. v. Snowden, 58 F. 342 (this court); Maryland Casualty Co. v. Eddy, 239 F. 477, 480-1 (C. C. A. 6) and Mutual Life Ins. Co. of N. Y. v. Powell, 217 F. 565, 568 (C. C. A. 5); Conn. Fire Ins. Co. v. Buchanan, 141 F. 877, 892, 894, 4 L. R. A. (N. S.) 758 (this court); Carrollton F. Mfg. Co. v. Credit Indem. Co., 115 F. 77 and 124 F. 25 (C. C. A. 2); Fidelity & C. Co. v. Phoenix Mfg. Co., 100 F. 604, 607,

608 (C. C. A. 7); Glover v. Ins. Co., 85 F. 125 (C. C. A. 4); Phœnix Ins. Co. v. Warttemberg, 79 F. 245 (C. C. A. 9); Standard L. & A. Ins. Co. v. Fraser, 76 F. 705, 708 (C. C. A. 9); Mutual Benefit Life Ins. Co. v. Robison (C. C.) 54 F. 580, 588–597; Sawyer v. Ins. Co. (C. C.) 42 F. 30, 34. In the recent case of Compania de Navegacion, Int., v. Fireman's Fund Ins. Co., 277 U. S. 66, 48 S. Ct. 459, 72 L. Ed. 787 (May 14, 1928), the court said:

"A contract of maritime insurance is usually not different from any other contract, except that the words and phrases used may have a technical nautical meaning, to be understood by the parties and enforced accordingly. We have seen, however, from the cases, that the phrase 'seaworthiness' varies with the circumstances and the exceptional features of the risk known to both parties. The view of the Circuit Court of Appeals that perils of the sea has an absolute meaning and may not be varied by the knowledge of the parties as to the circumstances and must be maintained stiffly in favor of the insurance companies and against the insured, is not necessary or reasonable. The variation in the significance of 'seaworthy,' as shown by the above authorities, when caused by exceptional circumstances known to both parties, applies as well to the meaning of perils of the sea as to that of seaworthiness. The two terms in such cases are correlative terms. Klein v. Globe & Rutgers Insurance Co. (C. C. A.) 2 F.(2d) 137, 139, 140.

"The Circuit Court of Appeals distinguished Klein v. Globe & Rutgers Insurance Company, Farmers' Feed Company v. Insurance Company [166 F. 111], and Thebaud v. Great Western Insurance Company [155 N. Y. 516, 50 N. E. 284], and 4 Joyce on Insurance, § 2159, as follows:

"'Recovery was allowed in each of those cases on the actual contract, which was held to be different from the contract evidenced by the insurance policy. It was merely held that effect should be given to the actual contract. The facts in this case do not warrant the conclusion that appellant bound itself by its conduct, or by any agreement, to accept the risk of unseaworthiness.'

"We find ourselves unable to follow this distinction. In all these cases the recovery was on the contract, and the question was of the construction of the contract. Its construction was affected necessarily by the special circumstances surrounding the contract known to both parties and acted on by them in charging and paying an increased compensation for the risk run. The circumstances in this case are very like those shown in the cases cited. They certainly justify the conclusion to which we have come."

Assuming, for the purposes of this point of estoppel, that the interest of the insured was not 100 per cent., as stated in the application, the findings must be examined to ascertain whether the question thus answered in the application, when considered in connection with the circumstances of ownership here involved, was reasonably susceptible of doubt as to its meaning and whether the insured and the agent of the insurer, in good faith, interpreted that question and answered it in accordance with that interpretation and with their view of the facts.

The facts as to ownership were as follows: Insured held the legal title to this farm. At the time of the application he had verbal contracts with several persons as to making the crops and a written contract with one E. D. Anthony as to an interest in the farm. The arrangement with the "croppers" was that they were to live on the farm with their families, though not upon the particular parts of the farm apportioned to each for cultivation. The insured paid for their transportation to the farm, directed what crops should be planted, furnished the seed, teams, implements, and all means of cultivation. He guaranteed and every 30 days paid the grocery and necessity bills required for these men and their families to live during the cultivation of the crop. The arrangement with them was that they were to cultivate and harvest the crop under his supervision and direction; that he was to have free control of the sale of the crops; that after payment of the expenses of the crop, including the advances he had made on their account, the net proceeds were to be divided by him and one-half paid to them. If any one of them failed to complete his contract, he was to leave the farm without any claim to share in the proceeds. Under this arrangement, it was not only possible for these men to forfeit all right to any part of the proceeds, but one of them actually did and was put off of the farm before the loss occurred under this policy. As the crop had not been harvested, at the time of the loss, there was, up to that time, a situation where all of them might have forfeited their rights and none of them been entitled to any of the proceeds.

The contract with Anthony was made about three months before the application for the insurance and was for the sale of an undivided one-half interest in the land, payment therefor to be made by three promissory notes, the first one due in January, 1927, for $5,000. Under this contract, no deed to Anthony was to be made by the insured unless and until this first note was paid. This contract was placed in escrow until such payment. The contract provided that the parties should be tenants and co-owners of the property and should be "partners only to the extent that they may become liable for any debts incurred on account of the operation of said farm." As to expenditures necessary in operating the farm "from and after" the date of the contract, Anthony became responsible for one-half and agreed to devote himself to the management and conduct of "said business and farming operations" for which services he was to receive compensation at the rate of $100 per month "out of the net proceeds derived from the crops raised upon said farm," and was to share equally in the net proceeds therefrom. This contract was executed in February, 1926; the application for insurance was made and the policy delivered in May, 1926; the loss occurred June 12, 1926, and the crop would have been harvested before January, 1927, when the first purchase note was payable. Therefore, it was entirely possible for Anthony to default on such payment and to lose all right to any share in the proceeds of the crop.

When the matter of this insurance was broached and in connection with the application showing the per cent. interest in the crop, the agent asked the insured "if he was the legal owner of the crop, in order to know whether to put in, how to fill out that portion of the application which states the percentage of ownership." The answer of the insured was that he was the legal owner of the property. The insured told the agent of his arrangement with the "croppers" and of his contract with Anthony. The agent went to the bank where the contract was in escrow and the contract was handed to him. Whether he read it or not, is not clear, but there is no question that he had the opportunity to do so. With this information and this full disclosure the agent wrote in the application.

From the above statement of facts, I am convinced that there was a serious question as to what answer would have been accurate in the application. That the "croppers" and Anthony had contractual rights in connection with the crop at the time of the application, is certain, but those rights seem to attach only to proceeds derived therefrom after harvest and sale and even such rights were uncertain, inchoate and might never fully ripen. At the same time, the legal title to the land and to the crops was in the insured and he had complete direction and supervision over the cultivation, farming, sale and disposition of any net proceeds. There is no room for question, in the evidence, of the good faith and fair dealing of either the insured or the agent.

I think the above facts and circumstances bring this case within the rule heretofore stated; that estoppel was fully pleaded; was shown by the evidence and the facts justifying such estoppel found by the court.

II. Plaintiff in error contends that the estoppel, pleaded in the reply, is a departure. This position is not well founded. N. J. Mut. Life Ins. Co. v. Baker, 94 U. S. 610, 612, 24 L. Ed. 268.

III. It is also objected that the judgment was erroneous in awarding full compensation on 100 per cent. interest in the crop insured because, in the application, which was made part of the policy, it was provided "it being understood and agreed that the liability of this company shall in no event be held to exceed the actual proportionate interest of the insured in the crops described and insured hereunder." This contention is not well founded because the quotation relied upon is an integral part of a sentence and paragraph which refers to other matters and is as follows:

"On all crops other than vine, truck, vegetable, tobacco and fruit crops, total insurance for all interest on the crops described herein shall not exceed thirty-six (36) dollars per acre on irrigated land, and twenty-four (24) dollars per acre on unirrigated land. However, in the event that the total insurance per acre exceeds this limit, this company shall be liable only for its pro rata part of such limit per acre, it being understood and agreed that the liability of this company shall in no event be held to exceed the actual proportionate interest of the insured in the crops described and insured hereunder. If the total insurance on this crop exceeds the maximum limits permitted hereunder, the company shall refund the premium on such excess."

IV. It is contended that the court erred in not permitting evidence as to statements made by the insured as to Anthony's in-

terest in the cotton crop. The interest of Anthony was set forth in a written contract which was introduced in evidence and which the insured testified contained all of the arrangements between them and as to which testimony there was no offer to prove the contrary. I can see no relevancy of the testimony excluded and think the court's action was proper.

I think the judgment should be affirmed.