2LOTTINGER, Chief Judge.
Defendant, State of Louisiana Board of Trustees (Board), appeals the trial court’s grant of summary judgment on the issue of coverage in favor of plaintiffs, Mr. and Mrs. Douglas James.
FACTS
The Board administers the State Employees Group Benefits Program (Program) which prior to July 1,1985, provided benefits for in-home nursing care of a registered nurse or licensed practical nurse when medically necessary and prescribed by a licensed medical doctor. Effective July 1, 1985, the Program was amended to provide benefits for nursing care only when the services were rendered in a hospital. The amendment included a “grandfather clause” which continued in-home nursing care benefits for persons receiving such benefits at the time of the change.
Mr. James, an employee of the Louisiana Department of Transportation and Development, was enrolled in the Program for medical coverage. Mr. James’ mother-in-law, Mrs. Josephine Reynolds, enrolled in the Program in 1980 as a “sponsored dependant parent.” In 1982, Mrs. Reynolds was diagnosed with cancer.
Plaintiffs allege that since June of 1985, Mrs. Reynolds required 24 hour in-home nursing care. They further allege that they attempted to claim benefits for in-home nursing care since at least August 2, 1985, by calling the telephone claim number provided to beneficiaries under the program. After their oral requests were denied, plaintiffs did not file written claims for in-home nursing care benefits.[1]
*1019 lain their original petition, plaintiffs sought benefits for the estimated cost of past and future in-home professional health care, statutory penalties and attorney’s fees, and legal interest. After the death of Mrs. Reynolds, they filed an amended petition which added a demand for tort damages. Plaintiffs then filed a motion for summary judgment on the issues of insurance coverage and attorney’s fees and penalties. The trial court granted the motion on the issue of coverage, but denied it as to penalties and attorney’s fees.
TRIAL COURT
In his oral reasons for judgment, the trial judge avoided the issue of whether the Louisiana Insurance Code applies to the Program by concluding that coverage was due as a matter of public policy. He stated that “it would be clearly against public policy for a contract to, after something has happened under a previously entered contract, for a subsequent contract to take part of that away in this fashion.”
ASSIGNMENTS OF ERROR
Defendants appeal, asserting that the trial judge erred in:
(1) holding that public policy prohibits a group health plan from applying benefit plan modifications to an individual covered person, with respect to a particular illness, once the illness is diagnosed and treatment commenced.
(2) failing to find that the State Employees Group Benefits Program is not governed by the provisions of La.R.S. 22:218.
ASSIGNMENT OF ERROR ONE
The issue raised by this assignment of error is whether public policy prohibits a group health plan from applying benefit modifications to an individual, with respect to a previously diagnosed and treated illness. The Louisiana Supreme Court Lwas faced with a similar issue in Cataldie v. Louisiana Health Service and Indemnity Company, 456 So.2d 1373 (La.1984). There the court considered the appropriateness of “cancellation” of an insurance policy after diagnoses of an illness.
Sam Cataldie and Blue Cross entered into a non-group contract of health and accident insurance in 1978. Id. at 1374. Cataldie’s daughter was diagnosed with brain cancer in 1981. Id. In 1982, Cataldie was forced to agree to cancel the policy after Blue Cross increased premiums and severely decreased coverage. Id. The Cataldie court held that the policy was subject to the provisions of La.R.S. 22:213(B)(7) which provides that “cancellation shall be without prejudice to any claim originating prior thereto.” Id. at 1375-76. Accordingly, Blue Cross was responsible for all claims arising out of the daughter’s illness which was diagnosed prior to the cancellation. Id.
Athough the court relied on the statute in granting coverage, it noted that the same conclusion could be reached under the abuse of rights doctrine. The majority of the court stated that:
When confronted with this type of situation all modern authorities we have found conclude that the policy cannot be terminated as to illness, injury or condition arising before the insurer’s cancellation. They differ only as to the theory of the decision: Ambiguity—Sparks v. Republic National Life Insurance Co., 132 Ariz. 529, 647 P.2d 1127 (1982), cert. den. 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982) (Cancellation of medical benefits policy); Public Policy—Brown v. Blue Cross & Blue Shield of Mississippi, 427 So.2d 139 (Miss.1983) (cancellation of medical benefits); Gulf Guaranty Life Insurance Co. v. Kelley, 389 So.2d 920 (Miss.1980) (attempted cancellation of credit life policy following insured’s heart attack); Detrimental Reliance—Mutual Ben. Life Ins. Co. v. Robison, 54 F. 580 (C.A.Iowa) aff'd 58 F. 723 (7th Cir.1893); Implied Covenant of Good Faith—Spindle v. Travelers Insurance Co., 136 Cal.Rptr. 404, 66 Cal.App.3d 951 (2d Dist.1977) (cancellation of medical malpractice policy). Reasonable Expectations of Insured Honored—See, Keeton Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 1961 (1970).
See also, Blue Cross—Blue Shield of Alabama v. Turner, 43 Ala.App. 542, 195 So.2d 807 (1966) (pregnancy benefits pay *1020 able despite prior cancellation of Rgroup hospital and medical expenses policy); National Life & Accident Ins. Co. v. Dove, 167 S.W.2d 257 (Tex.Civ.App.1942) (caneel-látion of health benefits not operative as to benefits for continuing illness). Dossey v. Life & Casualty Ins. Co. of Tenn., 177 So. 427 (La.App. 2d Cir.1937) (right to cancel life, health, and accident policy suspended as per insurance contract for disability existing at notice of cancellation); National Life Ins. Co. v. Jackson, 18 Ga.App. 494, 89 S.E. 633 (1916).
These theories involve many of the considerations which we would employ in deciding such a case as this under the abuse of rights doctrine. See e.g., Cueto-Rua, “Abuse of Rights” 35 La.L.Rev. 965 (1975); Comment, 42 La.L.Rev. 210 (1981). Since we have concluded that our decision is governed by the contract and statutory law, there is no need for us to consider that doctrine in this case.
Id. at 1376-77.
Shortly after the supreme court’s decision in Cataldie, this court decided Breland v. Louisiana Hospital Services, Inc., 468 So.2d 1215 (La.App. 1st Cir.1984). In Breland, the plaintiffs group health and accident insurance policy was canceled subsequent to his cancer diagnoses. Id. at 1216. After concluding that Cataldie’s statutory reasoning was inapplicable[2], we applied the abuse of rights doctrine to reach the same conclusion as the Cataldie court; it is against public policy and is unconscionable for an insurer to terminate an individual’s policy with respect to a previously diagnosed and treated illness. Id. at 1218-21.
Without deciding whether La.R.S. 22:213 is applicable in the present case, we again apply the abuse of rights doctrine to conclude that the Program’s modification regarding in-home nursing care may not alter plaintiffs’ benefits with respect to the previously diagnosed and treated cancer.[3]
UThe abuse of rights doctrine was described in Illinois Central Gulf Railroad Company v. International Harvester Company, 368 So.2d 1009, 1014 (La.1979) as follows:
In its origin, the abuse of rights doctrine was applied to prevent the holder of rights or powers from exercising those rights exclusively for the purpose of harming another, but today most courts in civil law jurisdictions will find an act abusive if the predominant motive for it was to cause harm. See, Cueto-Rua, supra, at 990-91; Catala and Weir, supra, at 222-26. The doctrine has been applied where an intent to harm was not proven, if it was shown that there was no serious and legitimate interest in the exercise of the right worthy of judicial protection. See, Cueto-Rua, supra, at 992-96; Catala and Weir, supra, at 230-34. Protection or enforcement of a right has been denied when the exercise of the right is against moral rules, good faith or elementary fairness. See, Cueto-Rua, supra, at 996-99. Another criteria, espoused originally by the French scholar Louis Josserand, would require an examination of the purpose for which the right was granted. If the holder of the right exercised the right for a purpose other than that for which the right was granted, then he may have abused the right. See, Cueto-Rua, supra, at 1000-1003; Catala and Weir, supra, at 227-29; Herman, supra, at 754-55.
Although an insurer may have the contractual right to cancel a policy, many courts hold that public policy prevents an insurer from terminating benefits with respect to previously diagnosed and treated illnesses. The Louisiana Supreme Court stated, in Cataldie, that it is unconscionable for an insurer to wait “until the risk had been realized before bringing about cancellation of the polic[y].” Cataldie, 456 So.2d at 1376. In deciding the same case, the Third Circuit noted that “public policy is offended” when an insurer cir *1021 cumvents the terms of a policy by canceling coverage after an insured risk arises. Cataldie v. Louisiana Health Service and Indemnity Company, 433 So.2d 367, 371 (La.App. 3rd Cir.1983). The Supreme Court of Mississippi has also held that public policy prevents the exercise of an insurer’s right to cancel a policy after the onset of a condition or fatal illness. See Brown v. Blue Cross & Blue Shield of Mississippi, Inc., 427 So.2d 139 (Miss.1983); Gulf Guaranty Life Insurance Co. v. Kelley, 389 So.2d 920 (Miss.1980).
I sin Breland, we reiterated these overwhelming public policy considerations and held that it would be an abuse of rights to allow a party to cancel a policy and avoid liability for an existing condition or illness. Breland, 468 So.2d at 1219-21. On rehearing, however, we noted that if the canceling party had a legitimate and serious interest in exercising its contractual right to cancel a policy, then the party has not abused its right.[4] Id. at 1223.
While the present case does not involve the “cancellation” of an insurance policy, we hold that the above principles apply to policy modifications which alter an individual’s benefits with respect to a previously diagnosed and treated illness or condition. The Board had the authority to modify the group plan. La. R.S. 42:871. Nevertheless, considering existing public policy considerations, we believe that it would be an abuse of rights to allow the modification to alter plaintiffs’ benefits with respect to Mrs. Reynolds’ previously diagnosed and treated cancer.
We next consider whether the Board had a serious and legitimate interest which would allow it to exercise its right even though it causes harm to the plaintiffs. The abuse of rights doctrine and its application in this context was developed prior to this case. Unlike the defendant in Breland, the Board had ample opportunity to present the court with serious and legitimate reasons for exercising its right to modify the contract.
In brief, the Board suggests that the modification was implemented as a cost containment measure. However, the Board presented no evidence to show that the modification was necessary for the preservation of the Program or that the Program was in danger of collapsing without the modification. After reviewing the record, we conclude that the Board did not have a serious and legitimate interest in exercising its I aright to modify the policy with respect to Mrs. Reynolds’ existing illness.
The risk contemplated by the parties was realized before the plan was modified, it would be unconscionable to allow the Program to avoid liability under these circumstances. Thus, we apply the abuse of rights doctrine to bar the Board from exercising its right to modify the Program to the plaintiffs’ detriment.
ASSIGNMENT OF ERROR TWO
Considering our analysis regarding defendant’s first assignment of error, we need not address the second assignment of error concerning the applicability of the Louisiana Insurance Code.
DECREE
For the above and forgoing reasons, the judgment of the trial court is affirmed and costs are assessed against the defendant in the amount of $976.88.
AFFIRMED.

. Plaintiffs submitted the affidavit of Ms. Doris-cene Moore who was employed by the Program as a Claim Service Supervisor from 1980 to November 19, 1986. In her affidavit Ms. Moore states that "shortly before July 1, 1985 and after July 1, 1985,” she received several inquiries from the plaintiff, Mrs. James, regarding in-home health care services for Mrs. Reynolds. Ms. Moore stated that on each occasion, she told Mrs. James that the claim "would not be honored, and that if expenses for home health care were incurred, they would not be reimbursed.” Ms. Moore further stated that the reason given to Mrs. James for the denial of the claim was the change in eligibility for in-home health care.
It appears from Ms. Moore’s affidavit that plaintiffs were "verbally” denied in-home nursing care benefits prior to the effective date of the policy change. Additionally, the record is unclear as to whether defendants informed plaintiffs of the "grandfather clause” during their early discussions concerning in-home nursing care benefits.
Although the absence of a written claim does not alter our decision, we offer the foregoing as an explanation for plaintiffs’ failure to file a formal claim.

. We noted that the Cataldie decision involved a non-group policy of health and accident insurance, whereas the Breland case involved a group policy. Id. at 1217. We concluded that pursuant to La.R.S. 22:221, the provisions of La.R.S. 22:213 were inapplicable to group policies. Id.

. Although plaintiffs did not file a written claim for in-home nursing care benefits, defendant received and paid a number of medical expenses associated with Mrs. Reynold’s cancer prior to July 1, 1985.

. In its application for rehearing. Blue Cross stated that it could prove that it exercised its contractual right to cancel the insurance policy "based on the legitimate interest of self-preservation as a corporate entity” and that "the evidence would reveal that Blue Cross was in critical danger of going bankrupt." Breland, 468 So.2d at 1224. Based on this information, we remanded the case to allow Blue Cross the opportunity to present evidence of these serious and legitimate interests. Id.