# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 06-878


**TYNES E. MIXON, III, M.D.**

**VERSUS**

**IBERIA SURGICAL. L.L.C., ET AL.**


\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, DOCKET NO. 99468-E
HONORABLE KEITH R.J. COMEAUX, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*\*\*\*
**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and Elizabeth A. Pickett, Judges.

**AFFIRMED.**


**ONEBANE LAW FIRM**
**Charles J. Boudreaux**
**Steven C. Lanza**
**(Appeal Counsel)**
**Michael D. Skinner**
**Michael G. Durand**
**1200 Camellia Boulevard, Suite 300**
**Post Office Box 3507**
**Lafayette, Louisiana 70502-3507**
**(337) 237-2660**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Tynes E. Mixon, III, M.D.**

**OTTINGER HEBERT, L.L.C.**
**Paul J. Hebert**
**(Appeal Counsel)**
**J. Bradley Duhe'**
**Post Office Box 52606**
**Lafayette, Louisiana 70505-2606**
**(337) 232-2606**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Iberia Surgical, L.L.C.**

**Gilbert F. Ganucheau, Jr.**
**Kathleen L. DeBruhl & Associates**
**614 Tchoupitoulas Street**
**New Orleans, Louisiana 70130**
**(504) 522-4054**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Iberia Surgical, L.L.C.**

**COOKS, Judge.**

## STATEMENT OF THE CASE

Tynes E. Mixon, III, M.D. filed a petition for damages asserting he was wrongfully terminated from his membership in Iberia Surgical, L.L.C. (Iberia Surgical) and did not receive adequate compensation for his interest in the business. Dr. Mixon later amended his petition alleging a claim under an "abuse of rights" theory. Iberia Surgical filed motions for summary judgment. The trial court granted the Defendant's motions dismissing all claims of Dr. Mixon against Iberia Surgical. Dr. Mixon filed this appeal. For the reasons assigned below, we affirm the judgment of the trial court.

## STATEMENT OF THE FACTS

Iberia Surgical was formed, in August 1998, by a group of physicians practicing in Iberia Parish for the purpose of establishing an ambulatory, out-patient surgery center. Each of the eleven physician members contributed $5000 and obtained a 9.09% interest in the business. The members executed a written Operating Agreement which provided a member may be terminated "without cause" upon unanimous vote of the membership. The contract also contained a "Buy-Out" provision in case of termination or withdrawal by one of the members. Dr. Mixon was one of the original organizers and became the managing partner.

In June 1999, Iberia Surgical, in a joint ownership venture with Iberia Medical Center, formed New Iberia Surgery Center, L.L.C., an outpatient surgical facility. Iberia Surgical owned an 80% interest and Iberia Medical Center owned a 20% interest in the new facility. The New Iberia Surgery Center was managed by a professional management company, Genesee & Associates, Inc.

Not long after the formation of Iberia Surgical, Dr. Mixon became dissatisfied

3

with the operation of the new facility and management practices of his fellow physicians. On several occasions, he voiced concerns regarding patient care and what he perceived to be violations of federal law in the handling of medicaid patients. When the members took no action regarding his complaints, Dr. Mixon met with federal authorities to report the alleged violations. He provided documents from Iberia Surgical to federal investigators, taped telephone conversations between himself and his partners, and, at one point, placed a voice-activated recorder in the trash can of the partnership meeting room. Dr. Mixon disclosed to several partners that he had reported them to federal authorities. Soon, Dr. Mixon began to realize his behavior was not well received among the partners and he may be terminated from membership in Iberia Surgical by a vote of the organization. In fact, a proposal was circulated to amend the by-laws of the Operating Agreement to require a majority vote to terminate a member instead of a unanimous vote. Dr. Mixon perceived this proposed change to be directed against him. He requested mediation and then filed a petition in district court for declaratory judgment and injunctive relief to prohibit the members from meeting to discuss the proposed change. His fears were well founded. After months of discord, and despite his legal protests, on August 28, 2002, Dr. Mixon was terminated from Iberia Surgical by unanimous vote of the membership. Pursuant to the Buy-Out provisions of the Operating Agreement, Dr. Mixon was paid $71,356.85, over a twelve month period for his membership interest. He negotiated the checks. To date, no state or federal charges have been filed against Iberia Surgical or any of its physician members.

## LAW AND DISCUSSION

Dr. Mixon contends there was no legitimate reason for his termination in Iberia Surgical since he was a productive member of the group and was, in fact, the number

five producer in terms of surgical procedures. Dr. Mixon further contends he was expelled from membership in Iberia Surgical solely because he complained of and reported allegedly improper activities and violations of federal law by Iberia Surgical and New Iberia Surgery Center. This termination, he maintains, violates the Louisiana Unfair Trade Practices and Consumer Protection Law, La.R.S. 51:1401 et seq. and the Louisiana whistleblower statute, La.R.S. 46:440.3(B). Additionally, Dr. Mixon asserts Iberia Surgical abused their right to terminate him from membership. He also alleges he was compensated for his ownership interest at a price far less than fair market value. We find neither the Louisiana Unfair Trade Practices and Consumer Protection Law or the Louisiana whistleblower statute provide a remedy for Dr. Mixon. Based on our review of the record, we conclude Dr. Mixon's release from membership in Iberia Surgical was done for legitimate business reasons and he was compensated, in accordance with the provisions of the Operating Agreement, which he helped draft. Each of Dr. Mixon's claims will be addressed below.

*Louisiana Unfair Trade Practices and Consumer Protection Law, La.R.S. 51:1401*
*Louisiana Whistleblower Statute, La.R.S. 46:440.3(B)*

The Unfair Trade Practices Law and Consumer Protection Law was enacted to prohibit "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The individuals falling within the ambit of its protection are consumers, defined under the Act as "any person who uses, purchases, or leases goods or services." A consumer transaction means "any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use." The statute authorizes the Attorney General to seek injunctive relief against business engaging in prohibited business practices. *Phillips v. Berner*, 00-0103 (La.App. 4 Cir. 5/16/01), 789 So.2d 41, *writ denied*, 01-1767 (La. 9/28/01), 798 So.2d 119, held this

5

statute applies to competitors or consumers and provides a remedy for unfair or deceptive trade practices. A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous or substantially injurious. A trade practice is "deceptive" for purposes of LUTPA when it amounts to fraud, deceit, or misrepresentation. The actions of Iberia Surgical in releasing Dr. Mixon from its membership under the terms of a contract mutually agreed upon does not amount to fraud, deceit or misrepresentation. Moreover, Dr. Mixon is not a "consumer or competitor" within the definition of the Act. We find no merit to this argument.

*Louisiana Whistleblower Statute, La.R.S. 46:440.3(B)*

Dr. Mixon alleges his termination from membership in Iberia Surgical was a direct result of his actions in reporting allegedly improper activities and violations of federal law by Iberia Surgical and New Iberia Surgery Center. He seeks to bring his actions within the scope of protection of Louisiana Revised Statutes 46:440.3, which provides, in relevant part:

> (B) No individual shall be threatened, harassed, or discriminated against in any manner by a health care provider or other person because of any lawful act engaged in by the individual or on behalf of the individual in furtherance of any action taken pursuant to this Part in regard to a health care provider or other person from whom recovery is or could be sought except that a health care provider may arrange for a recipient to receive goods, services, or supplies from another health care provider if the recipient agrees and the arrangement is approved by the secretary. Such an individual may seek any and all relief for his injury to which he is entitled under state or federal law.

> (2) A person aggrieved of a violation of Subsection A or B of this Section shall be entitled to exemplary damages.

This statute is part of the Louisiana Medical Assistance Programs Integrity Law adopted in 1997 and was intended to "protect the fiscal and programmatic integrity of the medical assistance programs from health care providers and other persons who

engage in fraud, misrepresentation, abuse or other ill practices, as set forth in this Part, to obtain payment to which there health care providers or persons are not entitled." La.R.S. 46:437.2(B). Dr. Mixon does not assert that Iberia Surgical fraudulently sought payment from the Medicaid Program to which it was not entitled. Rather, Dr. Mixon alleges Iberia Surgical was attempting to limit the number of Medicaid patients treated at the facility. Iberia Surgical's alleged effort to limit the referral of medicaid patients to the facility is not prohibited under the Louisiana Medical Assistance Programs Integrity Law. Therefore, the whistleblower provision of the statute contained in La.R.S. 46:440.3 does not apply. Moreover, the whistleblower provision under the Act is intended to protect individuals reporting violations under the statute from threats, harassment or discrimination. The actions of Iberia Surgical in terminating his membership does not rise to the level of threats, harassment or discrimination within the definition of the Act. We find no merit to this argument.

*Action for Abuse of Rights*

Dr. Mixon does not dispute the Operating Agreement allows for the termination of a partner by unanimous vote of the membership. Article 3.2(g) of the Operating Agreement provides:

> Termination Without Cause. A Member may be Terminated Without Cause, by unanimous vote in writing of the remaining Members of the Company. Such Termination Without Cause shall be treated as though the Member were expelled from the Company as provided in Section 3.2(e)(iv) above.

However, Dr. Mixon asserts the exercise of this contractual right by Iberia Surgical to terminate his membership was a abuse of right and violates moral rules, good faith, and elementary fairness. He also contends there was an absence of a serious or legitimate motive for the exercise of the right and, therefore, he concludes it was done

7

to cause harm. Dr. Mixon contends the trial court erred in determining Iberia Surgical could not be subject to an action for abuse of rights.

The abuse of rights doctrine is a civilian concept which is applied only in limited circumstances because its application renders unenforceable an individual's otherwise judicially protected rights. *Johnson v. KTBS, Inc.*, 39,022 (La.App. 2 Cir. 11/23/04), 889 So.2d 329. This doctrine applies when one of the following conditions is met: "(1) the predominant motive for exercise of the right is to cause harm; (2) there is no legitimate motive for exercise of the right; (3) exercise of the right violates moral rules, good faith, or elementary fairness; or (4) exercise of the right is for a purpose other than that for which it was granted." *Id.* at 334. This doctrine is typically applied in situations involving the cancellation of insurance coverage. Although the insurer may have right to modify or cancel the policy, the courts have held public policy considerations may prevent the insurer from exercising this right. For example, in *James v. State*, 93,0902 (La.App. 1 Cir. 4/8/94), 636 So.2d 1017, the appellate court held the abuse of rights doctrine prohibited a State group health insurance plan, from applying a benefit modification to an individual who was previously diagnosed and treated for cancer. The appellate court stated: "Although an insurer may have the contractual right to cancel a policy, many courts hold that public policy prevents an insurer from terminating benefits with respect to previously diagnosed and treated illnesses." *Id.* at 1020.

We agree with the trial court that Dr. Mixon cannot support a claim for abuse of right. The members of Iberia Surgical, including Dr. Mixon, negotiated a business agreement the purpose of which was to establish a profitable out-patient surgery center. There is ample evidence in the record, including Dr. Mixon's own testimony, to establish he objected to the way the facility was being managed and had serious

concerns regarding the distribution of income within the group. His views were not well received and represented the minority opinion within the organization. When the partners refused to cooperate with his suggestions, he reported them to federal authorities. Dr. Mixon then revealed to the partners that he had contacted federal investigators. Once this occurred, it became apparent that the animosity which existed between Dr. Mixon and his partners would be detrimental to the welfare of the business venture. A decision was made to buy-out Dr. Mixon's interest and sever financial ties with him. The Operating Agreement which Dr. Mixon negotiated and signed, gave Iberia Surgical the right to terminate one of its members without cause. Dr. Mixon has provided no evidence to suggest the termination was done to cause him harm or for any other reason than a legitimate business reason. The provisions of the Operating Agreement are straight-forward and provide a formula for compensation of its members in the event of a termination or withdrawal. There is no evidence to suggest the terms of the Operating Agreement violates moral rules, good faith, or elementary fairness. We find no merit to this argument.

*Adequate Compensation*

Dr. Mixon contends he was not adequately compensated for his interest in Iberia Surgical. The Buy-Out provisions of the Operating Agreement are contained in Article 3.3, which provides:

> Buy-Out Upon Termination of Membership; Fair Market Value Determinations. Upon termination of a Member's Interest, for any reason, there shall be no return of such Member's Capital Contribution(s). Any Member who voluntarily withdraws from the Company as provided in this Agreement shall be entitled to receive the value of such Withdrawing Member's Interest to be determined as set forth in Exhibit E, attached hereto. The value of the Withdrawing Member's Interest in the Company shall be in accordance with its "Fair Market Value" as of the most recent determination by the Company's accountant in that regard. Fair Market Value determinations as to Membership Interests shall be made by the Company's Accountant, unless otherwise unanimously agreed to in writing by the Management

9

Committee members, all in accordance with the provisions set forth in Exhibit E.

Exhibit E, Section 1, provides:

> (c)   Purchase Price and Terms.  The Purchase Price of a Former Member's Interest which is sold as a result of the occurrence of a Dissolution Event, shall be determined as follows:
>
> . . . .
>
> (ii) The "Book Value" means the "fair market value" of a Membership Interest computed in accordance with generally accepted accounting principles, of the net equity of the Company as of the end of the last full taxable year immediately preceding the year in which the Event giving rise to the purchase and sale of the Membership Rights or Interest occurred.   Notwithstanding anything contained in this Agreement to the contrary, the computation of Book Value shall be subject to the following provisions.
>
> (ff) Book Value shall be determined by the accountants regularly employed by the Company.  The determination of the accountants shall, for the purposes of this Agreement, be binding and conclusive upon all parties.

Dr. Mixon contends "Book Value" is not synonymous with "Fair Market Value." He contends the Operating Agreement requires his membership share should be computed according to the "Fair Market Value," which he defines as the price a seller is willing to accept and a buyer is willing to pay on the open market.  In support of his theory, he submits the affidavit of Chris Rainey, a certified public accountant and certified valuation analyst.  Mr. Rainey testified the appropriate method to use in determining the "Fair Market Value" of Iberia Surgical is to locate a comparable in the area.  His search for a comparable led him to the 1989 sale of Physicians Surgery Center in Houma.  Mr. Rainey determined Physicians Surgery Center was sold for a price equal to 9.89 times its net income.  He then determined the net income of Iberia Surgical for the tax year ending December 2001 was $806,062.  He multiplied that number by 9.89 and concluded the fair market value of Iberia Surgical to be $7,971,953.  Therefore, Mr. Rainey calculated Dr. Mixon's 9.09% equity interest, after discounting for a minority interest, was valued at $483,100.

We agree the terms "Book Value" and "Fair Market Value" are not synonymous and have generally recognized meanings in accounting in valuation. However, the Operating Agreement, Exhibit E, defines the terms interchangeably and specifically provides: "'**Book Value' means the 'fair market value**' of a Membership Interest computed in accordance with generally accepted accounting principles, of the net equity of the Company as of the end of the last full taxable year immediately preceding the year in which the Event giving rise to the purchase and sale of the Membership Rights or Interest occurred." (emphasis added). Under the agreement, the "Book Value shall be determined by the accountants regularly employed by the Company." We find the terms of the Operating Agreement clear and controlling in determining the amount owed to a member. Dr. Rainey's calculations were based on "fair market value" which was not the standard agreed upon by the parties.[1] Under the terms of the Operating Agreement, the parties agreed to use the "book value" in determining the value of a member's interest, not fair market value. The book value of a business "has a well-defined meaning, is unambiguous, and is susceptible of only one construction. It is the value as shown by the books of the business, and no other value." *Succession of Jurisich,* 224 La. 325, 69 So.2d 361, 362 (1953). Book value is calculated by measuring the assets of the business against its liabilities. Good will, actual value or value in the open market, is not considered in determining book value. *Id.*

Iberia Surgical submitted the testimony of Caroline C. Boudreaux, the certified public accountant hired to determine the amount owed to Dr. Mixon, under the terms of the Operating Agreement. Ms. Boudreaux testified she examined the books of the

---

[1] Dr. Rainey's calculations were based on a comparison of Iberia Surgical in New Iberia with a surgery facility in Houma. There is no evidence to suggest the two facilities are comparable and the same market factors are applicable, such as patient base and level of competition in the surrounding area.

11

business and calculated Dr. Mixon's interest to be $71,356.85. Dr. Mixon does not contend the calculations used by Ms. Boudreaux are incorrect. Instead, he contends she used "book value" instead of value in the open market or "fair market value." We find no error in the decision of the trial court finding Dr. Mixon was compensated in accordance with the terms of the Operating Agreement.

## DECREE

Based on the foregoing review of the record, we affirm the decision of the trial court granting summary judgment in favor of Iberia Surgical and dismissing all claims of Dr. Mixon. All costs of this appeal are assessed to Dr. Tynes Mixon, III.

**AFFIRMED.**